RACINE UNIFIED SCHOOL DISTRICT, Petitioner-Appellant,

v.

LABOR & INDUSTRY REVIEW COMMISSION, Respondent,

RACINE EDUCATION ASSOCIATION, Intervenor-Respondent.

Court of Appeals

*No. 90-1969. Submitted on briefs June 11, 1991.—Decided September 11, 1991.*

(Also reported in 476 N.W.2d 707.)

568

569

570

574

575

577

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Gilbert J. Berthelsen* and *Rex Anderegg* of *Capwell and Berthelsen* of Racine.

On behalf of the respondent, the cause was submitted on the brief of *James E. Doyle,* attorney general and *Laura Dulski,* assistant attorney general.

On behalf of the intervenor-respondent, the cause was submitted on the brief of *Mark F. Nielsen* of *Schwartz, Tofte, Nielsen & Denmark* of Racine.

Before Nettesheim, P.J., Brown and Scott, JJ.

NETTESHEIM, P.J. This appeal has its genesis in an employment policy adopted by the Racine Unified School District (the District) concerning employees with Acquired Immune Deficiency Syndrome (AIDS) or Aids-Related Complex (ARC).[1]

---

[1]The term "ARC"—aids related complex—refers to individuals who have two or more of certain symptoms which persist for three months or more. ARC develops into full-blown AIDS.

The Racine Education Association (the Union), as the bargaining agent for the District's teachers, challenged the policy, contending that it discriminated on the basis of handicap and sexual orientation contrary to the Wisconsin Fair Employment Act, sec. 111.31, *et seq.,* Stats. (WFEA). The Union further contended that the District caused the policy to be published or circulated within the meaning of sec. 111.322(2), Stats. Such activity constitutes a violation of the WFEA.

The Union prevailed before an Administrative Law Judge (ALJ) of the Department of Industry, Labor and Human Relations (DILHR). The ALJ awarded the Union, as the prevailing party, its attorney's fees and costs. The District sought administrative review and the Labor and Industry Review Commission (LIRC), after reducing the attorney's fees award, affirmed the ALJ's rulings. The District then sought judicial review. The circuit court affirmed LIRC's decision and awarded the Union additional attorney's fees related to the judicial review proceedings. The District further appeals to us, raising a host of issues under the WFEA. We affirm.

## FACTS

The controlling facts in this case are not in dispute. In March of 1985, Don Woods, Superintendent of the Racine Unified School District, began formulating a policy concerning AIDS and genital herpes. On November 4, 1985, Woods submitted a draft of the proposed policy

The policy also provided that *students* with AIDS or ARC be "placed in alternative education settings such as home tutoring or other appropriate educational programs." Because only those portions of the policy which relate to school district employees are germane to this appeal, we discuss the policy as if it were to be applied only to district personnel.

to members of the District's Board of Education for review. Copies of the policy were also forwarded to the Union. The policy was slated for consideration at the board's November 18, 1985 meeting.

On November 18, before the board meeting, a board committee known as the "Committee for the Whole" held a meeting at which members of the public gave their views concerning Woods' proposed policy. Following this meeting, the Board of Education debated the policy. After deleting all references to genital herpes, the board voted to adopt the policy as the District's official "Policy No. 5151" (hereafter Policy 5151).

The Committee of the Whole meeting and the board meeting were open to the popular press and the public. The press published accounts of the meeting. The minutes quoted the text of Policy 5151 in its entirety and the minutes were published in the press pursuant to sec. 120.11(4), Stats.

Policy 5151, as adopted by the Board of Education, provided in relevant part as follows:

1. Health (5151)

. . ..

Students or district staff members who have acquired immune deficiency syndrome (AIDS) or AIDS related complex are excluded from regular school attendance or attendance at work . . .. District employees who are so afflicted will be placed on sick leave or leave of absence until a determination can be made about a further work assignment.

With Policy 5151 formally in place, Woods, on December 5, 1985, submitted proposed guidelines for implementation of the policy to the board. At the same time, Woods informed the board that in November 1985,

the state legislature had enacted sec. 103.15, Stats.,[2] which provides, *inter alia,* that no employer may require testing of employees or prospective employees for the presence of HIV—the virus which causes AIDS—infection as a condition of employment or to affect the terms of employment.[3] The board took no action on the proposed guidelines, and on December 11, 1985, Frank Johnson, in-house counsel for the District, requested that the attorney general give an opinion concerning the legality of Policy 5151 under the WFEA, sec. 111.31, *et seq.,* Stats., and the District's exposure to civil liability under sec. 146.025(8), Stats., which penalizes violations of statutory restrictions on the use of HIV test data.

On February 6, 1986, the Union filed a complaint against the District with the Equal Rights Division of DILHR. The Union offered to settle the matter on a no-fault, no-cost basis if the District would withdraw the policy. The District did not respond.

In March of 1986, Johnson wrote the attorney general's office, requesting that it hasten, in light of the

---

[2]In their appellate briefs, the District and the Union state, incorrectly, that the relevant legislation now appears at sec. 105.15, Stats. The correct citation is sec. 103.15, Stats.

[3]The District states that Wood informed the board that the legislation which is now codified at sec. 103.15, Stats., was enacted on November 23, 1985, some four days *after* the board of education adopted Policy 5151. LIRC and the Union maintain the legislation was enacted on November 14, 1985, four days *before* the adoption of Policy 5151. While this difference does not affect the substance of our discussion here, we note that LIRC and the Union are correct. Section 103.15 was created by 1985 Assembly Bill 85 and enacted July 17, 1985. Section 103.15 was subsequently repealed and recreated by 1985 Assembly Bill 487, which was enacted on November 14, 1985. *See* sec. 1660m, 1985 Wis. Act 29 and sec. 2, 1985 Wis. Act 73.

Union's pending action, to issue its opinion regarding Policy 5151. In a May 1986, response to Johnson, the attorney general wrote that because it was the practice of his office to avoid rendering opinions on matters in litigation, no opinion concerning the legality of Policy 5151 would be forthcoming.

Throughout the period encompassing the foregoing events, the Board of Education took no formal action regarding the proposed administrative guidelines for the implementation of Policy 5151. The board also took no action to rescind or suspend Policy 5151 and the policy remained "on the books" as an official employment policy of the District. However, the District never applied Policy 5151 against any employee.

Following its investigation, DILHR issued an "Initial Determination" that the District had violated the WFEA on grounds of handicap and sexual orientation. In response, the District requested a hearing before an ALJ. A nine-day hearing on various dates in March, April and May of 1987 ensued before the ALJ. On October 9, 1987, the ALJ ruled that, in adopting Policy 5151, the District had not violated sec. 111.322(1), Stats., which prohibits actual acts of employment discrimination. However, the ALJ also determined that the District had violated sec. 111.322(2) which bars the printing or circulating by an employer of statements which evince an intent to discriminate on any basis forbidden by the WFEA.

After a separate hearing, the ALJ ordered the District to pay the Union $150,957.00 in attorney's fees, together with $11,820.58 in costs. This award was based upon *Watkins v. LIRC*, 117 Wis. 2d 753, 345 N.W.2d 482 (1984), which recognized the prevailing party's right to such fees and costs. The ALJ also ordered the District to

withdraw Policy 5151 from its compilation of official district policies.

The District then petitioned LIRC for review of the ALJ's decision. LIRC upheld the ALJ's decision on the merits, but reduced the award of attorney's fees to $73,980 and increased the award of costs to $11,916.08.

The District next sought judicial review of the LIRC determination. The circuit court upheld LIRC's rulings. In addition, the court increased the attorney's fees award to the Union by $2400, representing the additional fees incurred by the Union in the circuit court review. From these judgments, the District appeals.

## STANDARDS OF REVIEW

■

Our scope of review is identical to that of the trial court. *Racine Educ. Ass'n v. Commissioner of Ins.,* 158 Wis. 2d 175, 179, 462 N.W.2d 239, 241 (Ct. App. 1990). Although this appeal is from the circuit court's judgments, we are substantively reviewing the decision of LIRC. *See Drivers, Local 695 v. LIRC,* 154 Wis. 2d 75, 78 n.3, 452 N.W.2d 368, 369 (1990). Ordinarily the agency's decisions on questions of law are accorded weight ·because of the agency's special expertise and experience. *See id.* at 84, 452 N.W.2d at 372. But where the legal question concerned is one of first impression, the agency's interpretation is to be afforded no weight at all. *Id.* Section 111.322(2), Stats., has never been construed. We therefore review this matter *de novo. Id.*

■

The construction and application of a statute to an established set of facts present questions of law. *L&W Constr. Co. v. DOR,* 149 Wis. 2d 684, 688–89, 439 N.W.2d 619, 620 (Ct. App. 1989). In construing a statute, we are to give effect to the intent of the legislature.

*Castle Corp. v. DOR*, 142 Wis. 2d 716, 720, 419 N.W.2d 709, 710 (Ct. App. 1987). To ascertain legislative intent, we look first to the statute's language. *McMullen v. LIRC*, 148 Wis. 2d 270, 274, 434 N.W.2d 830, 832 (Ct. App. 1988). And, if the statute's meaning is clear, we will not look outside the statute; rather, we interpret the statute by the plain meaning of its terms. *See State v. Darling*, 143 Wis. 2d 839, 842, 422 N.W.2d 886, 887-88 (Ct. App. 1988).

## THE STATUTE

Section 111.322, Stats., provides that:

Subject to ss. 111.33 to 111.36, it is an act of employment discrimination to do any of the following:

. . ..

**(2)** To print or circulate or cause to be printed or circulated any statement, advertisement or publication, or to use any form of application for employment or to make any inquiry in connection with prospective employment, which implies or expresses any limitation, specification or discrimination with respect to an individual or any intent to make such limitation, specification or discrimination because of any basis enumerated in s. 111.321.

As we have noted, the controlling facts in this case are not in dispute. What the parties dispute is how the WFEA applies to the facts of this case and, in some instances, whether it applies.

## ISSUES
### 1. Application of the Statute to Existing Employees

The District's first line of defense is that sec. 111.322(2), Stats., is inapplicable to its adoption of Policy 5151. The District contends that the legislative his-

tory of the statute reveals that it was intended to apply *only* to the act of advertising for prospective employees and not to the printing of policies which affect existing employees.[4] Since Policy 5151 is aimed only at existing employees, the District contends that it has not violated the statute.

■

By looking to the legislative history of sec. 111.322(2), Stats., to support its argument, the District implies that the statute is ambiguous. However, legislative history cannot be used to demonstrate that a statute unambiguous on its face is ambiguous. *State v. Martin,* 162 Wis. 2d 883, 897 n.5, 470 N.W.2d 900, 905 (1991). Looking to the statute's structure and language, we conclude that sec. 111.322(2) is clear and unambiguous on the question of its application to existing employees.

In the statute's concluding portion, the legislature set out the discriminatory evil at which sec. 111.322(2), Stats., is directed. The statute condemns employer action:

> which implies or expresses any limitation, specification or discrimination with respect to an individual or any intent to make such limitation, specification *or* discrimination because of any basis enumerated in s. 111.321.[5]

---

[4]The District cites to an entry in the drafting file indicating that sec. 111.322(2), Stats., was intended to curb discriminatory hiring and advertising practices.

[5]Section 111.321, Stats., states:

**Prohibited basis of discrimination.** Subject to ss. 111.33 to 111.36, no employer, labor organization, employment agency, licensing agency or other person may engage in any act of employment discrimination as specified in s. 111.322 against any individual on the basis of age, race, creed, color, handicap, marital status, sex, national origin, ancestry, arrest record, conviction record or member-

*Id.* (emphasis added).

To combat such discrimination, the legislature identified and prohibited two categories of employment discrimination in sec. 111.322(2), Stats. First, the legislature declared it illegal for an employer "[t]o print or circulate or cause to be printed or circulated any statement, advertisement or publication" which seeks to discriminate. *Id.* Second, the legislature declared it illegal for an employer "to use any form of application for employment or to make any inquiry in connection with prospective employment" which seeks to discriminate. *Id. Only the second category addresses prospective employees. The first—which is the conduct we are concerned with in this case—does not.*

■

The legislature could have easily limited "publication or circulation" conduct to prospective employees. It obviously did not. Thus, the legislative intent is clear. If an employer prints or circulates a discriminatory employment policy, such constitutes a violation of the WFEA and is actionable.

The District contends, however, that its reading of sec. 111.322(2), Stats., is bolstered by federal employment discrimination case law and, in particular, 42 U.S.C. sec. 2000e–3(b) (1988). The District argues that since the WFEA appears to be modeled after the federal statute, we therefore should use federal court rulings interpreting federal antidiscrimination statutes for guidance when interpreting the WFEA. We are not persuaded.

■

The District subtly overstates our past reliance upon federal antidiscrimination law. True, Wisconsin

ship in the national guard, state defense force or any reserve component of the military forces of the United States or this state.

courts have at times looked to federal employment law for "guidance" in considering discrimination claims under the WFEA. *Hamilton v. DILHR*, 94 Wis. 2d 611, 621 n.4, 288 N.W.2d 857, 861 (1980). However, we are not bound to do so; see *id.*, and we are not, in this instance, in need of guidance as sec. 111.322(2), Stats., is clear on its face. Hence, no resort to legislative history or analogous federal statutes—let alone the legislative history of such persuasive authority—is necessary or permitted. *See Boles v. Milwaukee County*, 150 Wis. 2d 801, 813, 443 N.W.2d 679, 683 (Ct. App. 1989).

Moreover, we have previously held that we will refuse to interpret provisions of the WFEA in accordance with analogous federal laws where the statutory language differs from that of the federal legislation.[6]

---

[6]The District also overstates the resemblance between sec. 111.322(2), Stats., and 42 U.S.C. sec. 2000e–3(b) (1988). The WFEA and Title VII do bear a resemblance to each other, and as the District correctly observes, the legislative drafting file for ch. 334, Laws of 1981—the package of amendments to the WFEA in which sec. 111.322(2) was created—clearly shows some patterning on federal law. The two acts are not, however, clones. The text of 42 U.S.C. sec. 2000e–3(b) is a case in point:

It shall be an unlawful employment practice for an employer, labor organization, employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to print or publish or cause to be printed or published any notice or advertisement relating to employment by such an employer or membership in or any classification or referral for employment by such a labor organization, or relating to any classification or referral for employment by such an employment agency, or relating to admission to, or employment in, any program established to provide apprenticeship or other training by such a joint labor-management committee, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin, except that such a notice or

587

*McMullen,* 148 Wis. 2d at 275-76, 434 N.W.2d at 833. Such is the case here.

We conclude that sec. 111.322(2), Stats., applies to existing employees.

advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, or national origin when religion, sex, or national origin is a bona fide occupational qualification for employment.

Where, as here, the legislature has 'borrowed' from analogous federal legislation, differences in the language of 42 U.S.C. sec. 2000e-3(b) and sec. 111.322(2) must be presumed the result of deliberate choice exercised by the legislature.

Even if we were to draw upon federal case law, we cannot agree with the District that "virtually every decision" under 42 U.S.C. sec. 2000e-3(b) "has dealt with discriminatory advertising in the hiring process." (Emphasis omitted.) The District's contention is undercut by its own cited authorities. We note, for example, that among the cases cited by the District in its appellate brief, one— *Capaci v. Katz & Besthoff, Inc.,* 711 F.2d 647 (5th Cir. 1983), *cert. denied,* 466 U.S. 927 (1984)—concerned a pharmacist employee who was refused *promotion* into her drug store employer's management training program. There, the employee's claim was not even based upon 42 U.S.C. sec. 2000e-3*(b).* Rather, evidence of the employer's method of advertising for managers was used as evidence to bolster the pharmacist's class action suit for sex discrimination, which, because it was brought on a disparate impact theory, involved heavy use of statistics and other forms of circumstantial evidence. *See Capaci,* 711 F.2d at 656-61.

Moreover, while the District's other federal authorities do involve hiring decisions, we agree with LIRC that they hardly stand for the proposition that a case such as the one at bar could not be brought under the federal statute. Rather, all that may be deduced from the District's citations is that the issue has yet to be considered by the federal courts.

588

## 2. The "Print or Circulate" Requirement

We turn next to the question of whether the District printed Policy 5151 within the meaning of sec. 111.322(2), Stats. We hold that it did, albeit for reasons other than those articulated by LIRC.[7]

The District argued to LIRC that sec. 111.322(2), Stats., requires an element of volition on the *employer's* part, and that the *local news media*—not the District—committed the act of printing or circulating Policy 5151. The District argues that it cannot be said to have caused the printing of Policy 5151 in the local newspaper where it was required by law to permit the public and the press access to its meetings, and to submit the minutes of the meeting to the local newspaper for publication. LIRC responds that the District caused Policy 5151 to be printed or circulated because it knew that such would ensue from its adoption of the policy.

We conclude that reasonable persons could differ as to whether the "print or circulate" language of sec. 111.322(2), Stats., embraces the District's actions in this case. Therefore, the statute is ambiguous.[8] *See MPI Wis.*

---

[7]Because the issue presented is one of first impression, we do not hesitate to rule on grounds other than those employed by LIRC where the facts are undisputed, as they were before LIRC, and our review, also like that of LIRC, is confined to a question of law. *See Drivers, Local 695 v. LIRC,* 154 Wis. 2d 75, 84, 452 N.W.2d 368, 372 (1990). We emphasize that we accept the facts as found by LIRC. We question only the meaning to be assigned to certain of those facts in light of the relevant legal standard.

[8]Our conclusion that the 111.322(2), Stats., is ambiguous on this point is not inconsistent with our earlier conclusion that the statute is clear on the question of its application to existing employees. First, the "print or circulate" language was not germane to the question of whether the statute applied to existing

589

*Machining Div. v. DILHR,* 159 Wis. 2d 358, 367, 464 N.W.2d 79, 82 (Ct. App. 1990).

We do not disagree with LIRC that the District knew that Policy 5151 would be printed or circulated by the media. However, the statute does not punish *employer knowledge;* rather, the statute punishes *employer conduct* which prints or circulates discriminatory policy or which causes such to occur. Stated otherwise, the offending conduct under sec. 111.322(2), Stats., is not the *adoption* of discriminatory employment policy, but rather the *publication or circulation* of such policy.

Here, the District was compelled by the open meetings law, sec. 19.81, *et seq.,* Stats., to conduct its business in public. It also was compelled by sec. 120.11(4), Stats., to publish the minutes of its board meetings. The duties of the District under these laws were clear and unequivocal. As such, the District was required to participate in a process which "caused" Policy 5151 to be printed by the media.

We are not to construe statutes in an unreasonable fashion. *DOT v. Office of the Comm'r of Transp.,* 159 Wis. 2d 271, 275, 463 N.W.2d 870, 872 (Ct. App. 1990). LIRC's interpretation, which visits the media's conduct upon the employer, violates this principle of statutory construction. Moreover, conflicts between statutes are not favored. *Burlington N.R.R. Co. v. City of Superior,* 153 Wis. 2d 206, 211, 450 N.W.2d 486, 489 (Ct. App. 1989). We should not interpret one statute to compel certain conduct and another statute to punish the logical

---

employees. Second, the same statute may be found ambiguous in one setting and unambiguous in another. *Sauer v. Reliance Ins. Co.,* 152 Wis. 2d 234, 241, 448 N.W.2d 256, 259 (Ct. App. 1989).

and expected results of that conduct. Instead, we should seek reasonable interpretations which allow such "competing" statutes to peacefully co-exist, each serving their respective goals. *See id.* Our interpretation serves this end.

We therefore conclude that sec. 111.322(2), Stats., requires an affirmative act of volition by *the employer* in publishing or circulating its discriminatory statements. Such is not demonstrated by media coverage of school board meetings.

Our holding does not conclude this issue, however. The Union draws our attention to what it argues is another affirmative "print or circulate" act of the District: the inclusion of Policy 5151 in the public records of the Racine Unified School District as a policy of the District. This documentation, which the ALJ referred to as the "book of Croft Policies,"[9] is a compilation of the District's official policies and is binding on the District's administrators.

We agree that by inserting a copy of Policy 5151 into its collection of official, public documents, the District printed Policy 5151 within the meaning of sec. 111.322(2), Stats. The District was under no legal compulsion to include or maintain Policy 5151 in its book of official policies. Yet it did so despite the fact that: (1) Policy 5151 was legally suspect in light of the then-recent enactment of sec. 103.15, Stats., prohibiting, *inter alia,* an employer from requiring existing and prospective employees to undergo testing for the presence of HIV virus; and (2) the District was awaiting a response from the attorney general regarding its request for an

---

[9]The record contains no clue as to the significance of the term/name "Croft."

opinion on the legality of the policy. This act of inclusion was voluntary, and it constituted printing and circulating the policy in violation of the statute.[10]

### 3. Identifiable Victim

The District next contends that sec. 111.322(2), Stats., does not apply to its actions because no identifiable employee has been affected by Policy 5151. The District contends that some individual must suffer actual injury as a result of the printed statement.

Here again, the District reads the statute too selectively. The pertinent portion of sec. 111.322(2), Stats., states that it is unlawful for an employer to print a statement "which implies or expresses any limitation, specification or discrimination with respect to an individual *or any intent to make such limitation, specification or discrimination . . .."* (Emphasis added.)

The District zeroes in on the word "individual" in support of its argument. However, the words "intent to make" clearly contemplate future conditions. Nothing in this language suggests that a violation of this portion of the statute requires implementation of the offending policy against an existing or a prospective employee. By structuring the statute in this fashion, the legislature has addressed the evil of employment discrimination on the two fronts where it obviously is practiced—against existing employees and against prospective employees. As we have earlier said, the violation is complete when

---

[10]The absence of a LIRC ruling on this basis does not preclude our resolving this issue. As we have noted, the facts of this case are not disputed. The application of a statute to a set of facts presents a question of law. *West Bend Co. v. LIRC,* 149 Wis. 2d 110, 117, 438 N.W.2d 823, 827 (1989).

the policy is in place and then printed or circulated. These elements are satisfied here.

### 4. The Discrimination Requirement
#### A. Background

Next we address the District's claim that Policy 5151 is not a discriminatory statement within the meaning of the WFEA.[11] We begin by stating some fundamental principles of Wisconsin employment discrimination law.

Section 111.321, Stats., recites the bases upon which an employer may not discriminate.[12] Among these are sex and handicap, the two considerations at issue in this case. Discrimination on the basis of a person's sexual orientation is deemed a variant of sex discrimination under the WFEA. Section 111.36(1)(d)1, Stats. An

---

[11]LIRC correctly notes that the District did not expressly raise the sexual orientation aspects of this issue before LIRC. Therefore, LIRC argues that this issue is waived.

Waiver is a rule of judicial administration which does not affect the power of the appellate court to address the issues. *Wirth v. Ehly,* 93 Wis. 2d 433, 444, 287 N.W.2d 140, 146 (1980). Here, as in *Wirth,* there are no issues of disputed fact and the waived issue has been thoroughly briefed and answered at various stages of the proceedings below. The ALJ's decision is comprehensive on all issues before us. And even though LIRC did not substantively address every issue argued before the ALJ, LIRC did adopt the ALJ's decision in its entirety. The issue is one of first impression. Most importantly, it appears from the record that the two principal adversaries—the District and the Union—genuinely believed all the issues to be properly before this court. These issues, while hotly contested, rest upon undisputed facts. On balance, we choose not to invoke waiver on this issue against the District.

[12]See footnote 5.

employer may not engage in certain kinds of conduct based upon these factors. *See* sec. 111.322, Stats.

The WFEA's prohibition against handicap discrimination, unlike that of sexual orientation discrimination, is not absolute. An employer may "discriminate" on the basis of handicap *if* "the handicap is reasonably related to the [employee's/prospective employee's] ability to adequately undertake the job-related responsibilities of that [employee's/prospective employee's] employment . . .." Section 111.34(2), Stats. The employer bears the burden to prove this defense to a handicap discrimination claim provided the complainant first establishes that the condition at issue is a handicap within the meaning of sec. 111.32(8), Stats., and that the employer discriminated on the basis of that handicap, as prohibited by sec. 111.322, Stats. *See American Motors Corp. v. LIRC* 119 Wis. 2d 706, 709-10, 350 N.W.2d 120, 122 (1984).[13]

With these general principles in mind, we now turn to the specific issues concerning the statute's discrimination requirement.

B. Discrimination on the Basis of Sexual Orientation

Wisconsin law recognizes two theories of employment discrimination—the disparate impact theory and the disparate treatment theory. *See Wisconsin Tele. Co.*

[13]We note that *American Motors Corp. v. LIRC* 119 Wis. 2d 706, 350 N.W.2d 120 (1984), like many of the seminal handicap discrimination cases, was decided under a predecessor statute to secs. 111.32(8), 111.322 and 111.34, Stats. The changes in, and renumberings of, the relevant statutes affect neither *American Motors* nor the applicability of *American Motors* to the case at bar.

594

*v. DILHR*, 68 Wis. 2d 345, 368, 228 N.W.2d 649, 661–62 (1975). The disparate impact theory is invoked to attack facially neutral policies which, although applied evenly, impact more heavily on a protected group. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430–32 (1971).[14] Under the disparate treatment theory, the complainant must show that the employer treats some people less favorably than others because they belong to a protected class. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n.15 (1977). Thus, a complainant asserting a disparate treatment theory must prove discriminatory intent to prevail, while a complainant asserting a disparate impact theory need not offer any such proof. *See id.*

Throughout these proceedings, the Union has maintained, *inter alia,* that Policy 5151 would have a disparate impact upon homosexual and bisexual men, and that as a result, Policy 5151 discriminates on the basis of sexual orientation contrary to secs. 111.321, 111.322(2) and 111.36(1)(d)1, Stats. We now address the ALJ's findings, conclusions and opinion in light of the Union's disparate impact theory.[15]

The ALJ ruled that Policy 5151 discriminated on the basis of sexual orientation. In support, the ALJ relied upon the following findings of fact: (1) that seventy-three percent of persons with AIDS/ARC are homosexual and bisexual males; (2) that one member of

[14]Since Wisconsin and federal law recognize these alternative forms of theories, we conclude that federal law discussing these approaches is relevant and persuasive. *See Hamilton v. DILHR,* 94 Wis. 2d 611, 621 n.4, 288 N.W.2d 857, 861 (1980).

[15]Ordinarily our review is of LIRC. However, because LIRC did not address this issue, because we have elected not to apply waiver, and because LIRC adopted the ALJ's decision in its entirety, we speak in terms of reviewing the ALJ's ruling.

the Board of Education was quoted in the Racine Journal Times as stating that he voted in favor of the policy because he did not believe that homosexuals should be allowed to teach in the Racine Unified School District; and (3) that no attempt to retract or correct this statement was made by the District, the Board of Education, the superintendent, or the quoted board member. The ALJ's opinion also relied upon Wisconsin case law concerning "the problem of mixed motive discharges in the context of an unfair labor practice charge brought under the Municipal Employment Relations Act (MERA)."

While the "seventy-three percent of individuals with AIDS/ARC are homosexual and bisexual" men figure is a step in the right direction in a disparate impact analysis, it is not enough standing alone. A complete disparate impact analysis would have to include, *inter alia,* statistics showing, or allowing a reliable deduction, of the number of heterosexual District employees and the number of homosexual and bisexual District employees.[16] Such information is not present here.[17]

---

[16]To be complete, any disparate impact analysis must also include a conclusion as to whether the degree of disparity between the protected class and the non-protected class is of sufficient magnitude to establish a *prima facie* claim for disparate impact. *See, e.g., Rivera v. City of Wichita Falls,* 665 F.2d 531, 535 n.5 (5th Cir. 1982). In addition, the claimant must prove its disparity figures are statistically accurate to the degree, called a "confidence level," required by the law of the relevant jurisdiction. *See, e.g., Little v. Master-Bilt Products, Inc.,* 506 F. Supp. 319, 333 (N.D. Miss. 1980).

[17]Although the record contains a finding of fact that the District "does not, *to Dr. Woods'* [the superintendent's] *knowledge,* have any staff members with AIDS or ARC," (emphasis added), we hesitate to independently rule that all District employ-

Equally troubling is that the ALJ's decision contains no reference to the Union's disparate impact theory and does not otherwise address the elements of such a claim. Moreover, while the ALJ referenced certain facts relevant to a disparate impact claim, these do not satisfy a *prima facie* case for such a claim. *See, e.g., Rivera v. City of Wichita Falls,* 665 F.2d 531, 535 n.5 (5th Cir. 1982); *Little v. Master-Bilt Products, Inc.,* 506 F. Supp. 319, 333 (N.D. Miss. 1980).

Finally, we question the ALJ's reference to MERA and the "mixed motive" cases. This is a WFEA—not a MERA—case. MERA does not apply. Similarly, we fail to see the relevance of "mixed motive" cases. In those cases, the employer's actions are motivated by a mixture of discriminatory and legitimate reasons. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 246–47 (1989). Motive, mixed or otherwise, is not an element of a disparate impact theory claim. *International Brotherhood of Teamsters,* 431 U.S. at 335–36 n.15.[18]

In summary, the ALJ's findings are inadequate to support her conclusion of discrimination on the basis of sexual orientation. This, however, is not necessarily fatal to the Union's action if the District's policy nonetheless discriminated on the basis of handicap. We now address this question.

---

ees are heterosexual on the basis of such soft and potentially self-interested information.

[18]Therefore, the remarks of school board member Petak, even assuming they represent the official position of the District (and we do not suggest that they do), were not relevant to the Union's disparate impact claim.

## C. Discrimination on the Basis of Handicap

Three essentials comprise a handicap discrimination violation. *Boynton Cab Co. v. DILHR,* 96 Wis. 2d 396, 406, 291 N.W.2d 850, 855 (1980). First, the complainant must establish that the condition at issue is a handicap within the meaning of the WFEA. *Id.* Second, the complainant must show that the employer's discrimination was on the basis of handicap. *Id.* Third, it must appear that the employer cannot justify its alleged discrimination under the exception set forth in sec. 111.34(2), Stats. *See id.* We do not understand the District to dispute the existence of the second condition. Rather, the District argues that AIDS and ARC are not handicaps, and that, discrimination notwithstanding, Policy 5151 is justifiable in the interest of safety to the District's students and employees. We address each contention in turn.

### 1. AIDS/ARC as a Handicap

Section 111.32(8), Stats., defines a handicapped individual as one who:

(a) Has a physical or mental impairment which makes achievement unusually difficult or limits the capacity to work;

(b) Has a record of such impairment; or

(c) Is perceived as having such an impairment.

The supreme court has developed a two-step process for determining whether a particular physical or mental condition is a handicap. *City of La Crosse Police & Fire Comm'n v. LIRC,* 139 Wis. 2d 740, 760, 407 N.W.2d 510, 518 (1987). The first inquiry is whether the condition at

issue is a real or perceived impairment. *Id.* at 761, 407 N.W.2d at 518. For the purposes of this section, an impairment is "a real or perceived lessening or deterioration or damage to a normal bodily function or bodily condition, or the absence of such bodily function or such bodily condition." *Id.* A perceived impairment is a belief by the employer that an employee has a condition which, if it in fact did exist, would constitute an actual impairment. *Id.* at 760, 407 N.W.2d at 517-18.

If this initial step is satisfied, the second inquiry is whether the impairment actually makes or is perceived as making achievement unusually difficult or limiting the capacity to work. *Id.* at 761, 407 N.W.2d at 518. Of this latter requirement, the two conditions are to be read disjunctively: Either the claimant must show that the real or perceived impairment makes or is perceived as making achievement unusually difficult, or the claimant must show that the real or perceived impairment limits or is perceived as limiting the capacity to work. *Id.*

As to the first prong, the ALJ found that AIDS and ARC are real impairments because they are actual handicaps pursuant to sec. 111.32(8)(a), Stats. As to the second prong, the ALJ determined the District perceived the handicap as making the achievement unusually difficult and limiting the capacity to work pursuant to sec. 111.32(8)(c). The District challenges both of these determinations.[19]

---

[19]In its brief-in-chief, the District addresses both the real handicap and perceived handicap issues. However, in its reply brief, the District contends the "ALJ relied solely upon the precept that [it] 'perceived' that individuals with AIDS are impaired . . .." The latter contention is without support in the record. Hence, we address both issues in this opinion.

### a. Actual Impairment

The District mounts two arguments against the ALJ's actual impairment determination. First, the District contends that AIDS/ARC cannot be actual impairments because "[m]any persons with AIDS are unimpaired and fully capable of performing their work . . .." The District argues that the expert testimony at the hearing indicated that a determination of handicap "would depend upon the individual's particular condition at a particular point in time."

The District's argument is directly contrary to the governing case law. Persons with diseases may be deemed handicapped under the WFEA, even if the disease is in remission or the person is not otherwise actively suffering from the effects of the disease. *See Chicago, Milwaukee, St. Paul & Pacific R.R. v. DILHR*, 62 Wis. 2d 392, 398–99, 215 N.W.2d 443, 446 (1974).[20]

> The Wisconsin Fair Employment [Act] was promulgated so as to encourage and foster to the fullest extent practicable the employment of all properly qualified persons. To accomplish this goal, the [WFEA] restrict[s] the employer's right to discriminate against those individuals who, though . . . handicapped . . . could function efficiently on the job. *If the individual can function efficiently on the job, then the mere fact that he [or she] is different from the average employee as to those statutorily*

---

[20]Relying upon persuasive authority, the ALJ ruled that an impairment may constitute a handicap within the meaning of the WFEA even if the condition causing it is contagious or communicable to others. The District does not appear to contest this ruling on appeal, hence we do not address it.

*proscribed bases may not be used as a basis for discrimination.*

*Id.* at 397, 215 N.W.2d at 445 (emphasis added).

This rule does not leave an employer without recourse if confronted with an existing or prospective employee who truly could not perform the required duties. Protected status under the WFEA is not synonymous with job entitlement; it is simply a means by which the employee may put the employer to its defensive proof. If the claimant shows that he or she was discriminated upon *because of* the handicap, *American Motors Corp.,* 119 Wis. 2d at 710, 350 N.W.2d at 122, the burden then shifts to the employer to justify the employment decision. *Id.* Only if the employer fails to legitimate its decision is employment discrimination said to have occurred. *See id.* The District fails to appreciate that its threshold argument against application of the WFEA is more properly raised as a defense pursuant to the statutory scheme.

Next, the District claims that the ALJ's actual impairment ruling is "academic" because the Union did not demonstrate that an individual was actually affected by the policy. This argument is a revisitation of the District's earlier argument which we have already rejected. *See supra* pp. 593–94. As we earlier noted, this action did not arise under sec. 111.322(1), Stats., which provides a cause of action for accomplished acts of discrimination. Rather, as we have noted, the Union brought this action, in part, under sec. 111.322(2), which creates a cause of action for statements printed or circulated by the employer which proclaim its present *or future* intent to discriminate.

The facts of record indicate that persons with AIDS or ARC have been infected by the HIV virus, which diminishes the immune system's ability to ward off illness. In turn, persons so affected become increasingly susceptible to, and unable to fight off, illness. Persons with AIDS and ARC thus fall prey to diseases and infections which the normal immune response would neutralize. Virtually all persons with ARC develop AIDS. And AIDS is, as of this writing, ultimately fatal. Under the *La Crosse* definition, AIDS and ARC clearly represent real deterioration or loss of bodily function which could make achievement unusually difficult or diminish the capacity to work. *See City of La Crosse,* 139 Wis. 2d at 761, 407 N.W.2d at 518. These facts support the ALJ's determination that AIDS/ARC constitute an actual impairment within the meaning of the statute.

### b. Perceived Limited Capacity to Work

The District also disputes the ALJ's conclusion that the District perceived AIDS and ARC as making its employees' achievement unusually difficult or limiting its employees' capacity to work, under sec. 111.32(8)(c), Stats. Instead, the District contends that Policy 5151 reflected its concern that AIDS/ARC is a contagious, fatal disease and that it does not perceive such individuals so afflicted as incapable or limited in their work capacity.

LIRC and the Union counter that this argument is disingenuous, and we agree. It is abundantly clear that the District did not regard persons with AIDS or ARC as capable of performing their assigned work because, by the plain and unequivocal terms of the District's own policy, employees with AIDS or ARC were to be relieved

of their duties without exception. Put differently, Policy 5151 represented a conclusive presumption on the District's part that persons with AIDS or ARC are inherently *in*capable of performing on the job.

Alternatively, the District argues that it was motivated by safety concerns for both students and employees, including an employed AIDS victim, and not by a perception that AIDS/ARC-affected employees are impaired. For the most part, this argument travels to the "job-relatedness defense" provisions of sec. 111.34(2), Stats., a matter we will discuss later. However, we do address at this juncture the District's argument as it pertains to an AIDS-infected employee.

The District's argument is strikingly similar to the one broached by the employer in *Dairy Equip. Co. v. DILHR*, 95 Wis. 2d 319, 290 N.W.2d 330 (1980), the seminal "perceived handicap" case. There, the employer, a manufacturer of stainless steel tank trailers, discharged a tank assembler who had only one kidney. The employer maintained that, while the employee's work was satisfactory, he "could not work on top of the steel tanks" because "if he fell he might injure his remaining kidney." *Id.* at 331, 290 N.W.2d at 336. The company additionally complained that further employment posed "too great a risk, both from the humanistic standpoint of . . . injuring the man and from a cost standpoint to the company." *Id.* at 331, 290 N.W.2d at 336.

The supreme court ruled that the employer perceived the assembler to be handicapped, and that a perceived handicap is a handicap within the meaning of the WFEA.[21] *Id.* at 331, 290 N.W.2d at 336. The supreme court reasoned that:

[21]Section 111.32(8)(c), Stats., is a codification of the Wisconsin Supreme Court's holding in *Dairy Equip. Co. v. DILHR*, 95 Wis. 2d 319, 290 N.W.2d 330 (1980).

> It would be both ironic and insidious if the legislative intent in providing the protection of the Fair Employment Act were afforded to persons who actually have a handicap that makes "achievement unusually difficult" or limits their capacity to work, but the same protection is denied to those whom employers *perceive* as being handicapped.

*Id.* at 330, 290 N.W.2d at 335. (Emphasis in original.)

The District apparently contends that while fear may form the basis for a perception that an employee's capacity to work is diminished, concern cannot. *Dairy Equipment* rejected this semantic distinction. Instead, *Dairy Equipment* stands for the proposition that those employees capable of working, yet posing a risk of inability to work in the future, are among the persons the WFEA was designed to protect. Therefore, the District's contention actually argues for—not against—application of the WFEA.

### c. The Job-Relatedness Defense

We turn now to the third and final component of a viable handicap discrimination claim: whether the District justified its actions under the "job-relatedness" exception found in sec. 111.34, Stats.

Section 111.34(2), Stats., provides, in relevant part, that it is not an act of employment discrimination for an employer to discriminate on the basis of handicap if the employee's handicap is "reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment . . .." In evaluating whether a handicapped employee may undertake the job-related responsibilities of his or her employment, the employer is allowed to consider potential risk posed by the handicap to the future safety of the handi-

capped employee, the employee's co-workers and the public generally. Section 111.34(2)(b). And, where the employer's line of business involves a "special duty of care for the safety of the general public," the employer may also factor that special duty into its evaluation of a handicapped employee. Section 111.34(2)(c).

In order to avail itself of this defense, the employer bears the burden to prove, to a "reasonable probability," that the ostensibly safety-based employment restriction is necessary to prevent harm to the employee or others. *Bucyrus-Erie Co. v. DILHR,* 90 Wis. 2d 408, 421, 280 N.W.2d 142, 148 (1979). The stringent "reasonable probability" standard is eased, however, where the employer's line of business is such that a number of persons could potentially be harmed by the handicapped employee. Where the employment involves a "special duty of care for the safety of the general public," the employer need only show that the otherwise discriminatory practice bears a "rational relationship" to its safety obligations to the public and the employee's co-workers. See sec. 111.34(2)(c), Stats.; *Boynton Cab,* 96 Wis. 2d at 404, 291 N.W.2d at 854; *Samens v. LIRC,* 117 Wis. 2d 646, 663, 672, 345 N.W.2d 432, 439, 444 (1984).

Section 111.34(2), Stats., makes clear, however, that the employer may not engage in *en masse* justification of an otherwise discriminatory employment practice. Both subsecs. 111.34(2)(b) and (c) recite that any evaluation of a handicapped person's ability to undertake the job-related responsibilities of his or her employment "*shall be made on an individual case-by-case basis and may not be made by a general rule which prohibits the employment . . . of handicapped individuals in general*

*or a particular class of handicapped individuals."* (Emphasis added.)

Holding the District to this "reasonable probability" burden, the ALJ ruled that the District had failed to prove that employees with AIDS/ARC posed a threat to the safety of others. Here on appeal, the District and the Union argue back and forth regarding the proper burden of proof and whether or not that burden was met. LIRC argues, however, that we should not reach such issues because Policy 5151 is a "blanket rule" which negates the District's opportunity to justify its actions under sec. 111.34(2), Stats. We agree.

****

Section 111.31, Stats., the WFEA's declaration of policy, emphasizes that "[i]t is the intent of the legislature in promulgating this subchapter to encourage employers to evaluate an employe . . . based upon the employe's . . . individual qualifications *rather than upon a particular class to which the individual may belong."* Section 111.31(2) (emphasis added). When multiple statutes are contained in the same chapter and assist in implementing a common object or policy, they are to be read *in pari materia,* and harmonized. *Suburban State Bank v. Squires,* 145 Wis. 2d 445, 449, 427 N.W.2d 393, 395 (Ct. App. 1988). Reading the legislature's policy declaration in sec. 111.31 together with the prohibition against "blanket" job-related defenses in sec. 111.34(2), Stats., the legislature's message could not be clearer.[22] Thus, the District will not be heard to argue its

---

[22]The ALJ rejected the Union's argument on this point, reasoning that "it is unlikely that the legislature would have intended that a general rule of exclusion would be unlawful if in fact an employer could prove that *every* individual with a particular handicap would be a threat to the present or future safety of others in the work place." (Emphasis in original.) Regardless, the

claimed affirmative defense. *See generally Bothum v. DOT,* 134 Wis. 2d 378, 396 N.W.2d 785 (Ct. App. 1986).

■ Taking a different tack, the District argues that Policy 5151 is not a general rule of exclusion because the guidelines for its implementation contemplated individualized evaluations. This argument is flawed because it treats the policy and the guidelines as essentially one and the same document. While the administrative guidelines for Policy 5151—in contrast to the policy itself—may well have provided for case-by-case evaluation of AIDS/ARC-affected employees, it remains that the guidelines never progressed beyond the proposed draft stage.[23]

The board of education took no formal action on the guidelines. The text of the proposed guidelines did not appear alongside the text of Policy 5151, nor were the guidelines ever independently printed or circulated in a fashion which would allow anyone to determine that the District intended Policy 5151 to be carried out on an individual basis. Thus, Policy 5151 alone stands as the

---

WFEA is clear in its requirement that the employer must make an individualized assessment—not a blanket rule.

[23]Although we hold that the guidelines cannot provide the District access to the defense to handicap discrimination under sec. 111.34(2), Stats., because they were never formally adopted and incorporated into Policy 5151, we observe that they are otherwise flawed. Policy 5151 called for employees with AIDS/ARC to be relieved of their duties; the proposed administrative guidelines provided that if the employees so removed could prove, on a case-by-case basis, that they posed no danger to their own health and the health of others, they could then return to their jobs. This procedure impermissibly shifts the burden from the employer to justify its actions which discriminate to the employee to show why he or she should not be discriminated against. *See Samens v. LIRC,* 117 Wis. 2d 646, 664, 345 N.W.2d 432, 439 (1984).

official and published statement of the District's employment policy in this area; and that policy alone forms the basis for this action under sec. 111.322(2), Stats. The guidelines, existing only as the conception of the superintendent—who is alone powerless to give them effect—cannot form the basis of a defense to employment discrimination under sec. 111.34(2), Stats.

### 5. Attorney's Fees

The ALJ awarded attorney's fees to the Union as the prevailing party in this action. LIRC, after reducing the award, confirmed this entitlement. The circuit court confirmed LIRC's ruling and awarded the Union additional attorney's fees relating to the judicial review proceedings. The District argues that the Union is not a "prevailing party" in this litigation and therefore is not entitled to recoup its fees. We disagree.

We address two of the arguments which the District offers in support of its position.[24] First, the District contends that the Union did not prevail on its own claim, but rather "only on an issue raised by the ALJ." The District contends that the Union claimed the District had violated sec. 111.322*(1)*, Stats., but the ALJ ruled that the District had violated sec. 111.322*(2)*. The District cites to *Hensley v. Eckerhart*, 461 U.S. 424, 436

---

[24]The District actually claims the award of attorney's fees is invalid for a third reason. The District contends that "the administrative agency was overzealous in its approach to awarding attorneys fees." In particular, the District points out that certain fee enhancement calculations made by the ALJ were "later reversed by the Commission." We fail to see, nor does the District explain, how a fee calculation error, which was later corrected, establishes that the Union is not entitled to collect fees in *any* amount. Consequently, we do not address this argument.

(1983), in support. *Hensley* indeed does provide that a party may not be entitled to attorney's fees where only partial success is obtained.[25] However, the District ignores the *Hensley* Court's definition of partial success:

> Many civil rights cases will present only a single claim. In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the . . . court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.
>
> Where a plaintiff has obtained excellent results . . . the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit . . .. *The result is what matters.*

*Id.* at 435 (emphasis added; citation omitted).

The District would have us rule that actions under secs. 111.322(1) and 111.322(2), Stats., are wholly different claims, involving wholly different elements of proof. They are not. Subsections (1) and (2) simply describe different types of affirmative discriminatory actions. Apart from the publication element, and the fact that one subsection requires actual discrimination while the other does not, the elements of proof for the claimant are *the same* under both subsections. The claimant must

---

[25]This court has recently adopted the Supreme Court's approach in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *See Radford v. J.J.B. Enterprises, Ltd.*, 163 Wis. 2d 534, 472 N.W.2d 790 (Ct. App. 1991).

prove that the employer's actions: (1) were targeted at or impacted upon a member or members of a protected class; and (2) were undertaken because of the employee's membership in a protected class and not some other reason. *Samens,* 117 Wis. 2d at 658, 345 N.W.2d at 437.

The Union proved a violation of the WFEA, and was granted its requested relief. *Hensley* teaches that the Union's success was not merely partial. *See Hensley,* 461 U.S. at 435. The District's argument represents impermissible "claim-slicing."

Moreover, the record in this case reveals that the Union filed a letter with the Equal Rights Division in support of its request for issuance of a complaint. In this letter, the Union specifically referenced sec. 111.322(2), Stats., (among other statutes) as the basis for the requested action. The Union's brief filed with the ALJ did likewise. The District's claim that the genesis for a sec. 111.322(2) violation lay entirely with the ALJ is not accurate.

For its second argument, the District contends that because Policy 5151 was never implemented, the Union's victory is only "technical" and, as such, cannot support an award of attorney's fees. The District rests its argument on *Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782 (1989), where the Supreme Court held that a prevailing party for the purposes of attorney's fees is one whose success works a "material alteration of the legal relationship of the parties . . .." *Id.* at 792–93. The District contends that such alteration has not occurred here.[26] *Texas State Teachers Ass'n,* however, concerned attorney's fees in an action under 42

---

[26]According to the District, the only relief procured by the Union is "the moral satisfaction of knowing that a state court concluded its rights had been violated."

U.S.C. sec. 1988. That case has no applicability to actions arising under the WFEA.

The Wisconsin Supreme Court has expressly held that reasonable attorney's fees may be awarded to the victor in an action under the WFEA because "a complainant who files a complaint under the Fair Employment Act is acting as a 'private attorney general' to . . . implement a public policy that the legislature considered to be of major importance." *Watkins,* 117 Wis. 2d at 764, 345 N.W.2d at 488.[27] Here, the Union successfully prevented the District from pursuing a published official policy of unlawful employment discrimination against certain of its members. As such, the public policy of this state as expressed in the WFEA has been successfully defended.[28] This was no mere "moral" or "technical" victory. Pursuant to Watkins, the Union was properly awarded its attorney's fees in this action.

*By the Court.*—Judgments affirmed.

---

[27]The District acknowledges *Watkins v. LIRC* 117 Wis. 2d 753, 345 N.W.2d 482 (1984), but gives us no persuasive reason why it does not control the issue before us.

[28]For these same reasons, we would conclude that the Union's success has worked a "material alteration of the legal relationship of the parties," if *Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 792–93 (1989), applied to this case.