# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2021AP2028

†Petition for Review filed

Complete Title of Case:

      WINGRA REDI-MIX INC.,

        PLAINTIFF-APPELLANT,†

     V.

      LABOR & INDUSTRY REVIEW COMMISSION,

        DEFENDANT-RESPONDENT,

     SCOTT GILBERTSON,

        INTERVENOR-RESPONDENT.

| | |
|---|---|
| Opinion Filed: | June 8, 2023 |
| Submitted on Briefs: | June 27, 2022 |

| | |
|---|---|
| JUDGES: | Blanchard, P.J., Fitzpatrick, and Graham, JJ. |

| | |
|---|---|
| Appellant<br>ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Robert S. Driscoll* and *Shannon M. Toole* of *Reinhart Boerner Van Deuren s.c.*, Milwaukee. |
| Respondent<br>ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Steven C. Kilpatrick*, assistant attorney general, and *Joshua L. Kaul*, attorney general. |
| | On behalf of the intervenor-respondent, the cause was submitted on the brief of *James A. Walcheske, Scott S. Luzi,* and *David M. Potteiger* of *Walcheske & Luzi, LLC*, Brookfield. |

COURT OF APPEALS
DECISION
DATED AND FILED

June 8, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2021AP2028**

STATE OF WISCONSIN

Cir. Ct. No. 2020CV1812

IN COURT OF APPEALS

WINGRA REDI-MIX INC.,

PLAINTIFF-APPELLANT,

V.

LABOR & INDUSTRY REVIEW COMMISSION,

DEFENDANT-RESPONDENT,

SCOTT GILBERTSON,

INTERVENOR-RESPONDENT.

APPEAL from an order of the circuit court for Dane County: NIA TRAMMELL, Judge. *Affirmed and cause remanded.*

Before Blanchard, P.J., Fitzpatrick, and Graham, JJ.

¶1     GRAHAM, J.   Wingra Redi-Mix, Inc., appeals a circuit court order that affirmed an order of the Wisconsin Labor & Industry Review Commission

("LIRC"). In its order, LIRC determined that Wingra violated the Wisconsin Fair Employment Act ("the Act") when it discriminated against its former employee, Scott Gilbertson, by refusing to reasonably accommodate his disability, which resulted in the termination of his employment. LIRC ordered Wingra to reinstate Gilbertson, and it awarded him back pay, attorney fees, and costs. Wingra challenges several aspects of LIRC's order.

¶2      Most prominently, Wingra argues that it did not have any obligation under the Act to accommodate Gilbertson's disability and cannot be liable for failing to do so. Wingra advances various arguments to support this proposition, but they are all variations on a single theme—according to Wingra, the fact that Gilbertson was not diagnosed with a disability until after his employment with Wingra ended forecloses any liability Wingra might have for refusing to accommodate his disability. We reject Wingra's arguments, largely based on the facts found by LIRC, which Wingra has not shown to be erroneous. More specifically, LIRC found that Wingra knew that Gilbertson had complained of a physical condition that was consistent with a disability, and that he had requested an accommodation to address the physical limitations that he was experiencing, which were interfering with his ability to perform his job. According to LIRC, the information Gilbertson provided "should have put [Wingra] on notice that [Gilbertson] was making a disability accommodation request," and there is no evidence to suggest that Wingra could not have reasonably accommodated Gilbertson's disability. However, rather than providing an accommodation, Wingra foreclosed any further discussion by "immediately and categorically denying" Gilbertson's accommodation requests for business reasons. Under these circumstances, we agree with LIRC that Wingra violated the Act by refusing to reasonably accommodate Gilbertson's disability.

¶3    Wingra also challenges LIRC's determination that it terminated Gilbertson's employment, as well as various aspects of LIRC's award of back pay and attorney fees.  We reject Wingra's arguments because LIRC did not erroneously interpret any provision of the Act and its factual findings are supported by substantial evidence.

¶4    Accordingly, we affirm the decision of the circuit court and remand for an award of Gilbertson's reasonable attorney fees for the proceedings in the circuit court and on appeal.

## BACKGROUND

¶5    Gilbertson initiated this case by filing a disability discrimination complaint with the state department of workforce development, which eventually proceeded to a contested case hearing before an administrative law judge. Gilbertson testified at the hearing, as did his medical professionals and his former Wingra managers and colleagues.  The exhibits introduced at the hearing included email correspondence between Gilbertson and his former managers.  The following summary of facts is taken from LIRC's findings and is supplemented, as needed, by undisputed evidence from the hearing.

### Factual Background

¶6    Wingra is a Wisconsin-based employer in the business of delivering ready-mix concrete to commercial and residential construction sites.  Gilbertson was employed by Wingra as a ready-mix truck driver for just over two years, starting in June 2011.  His principal job function was to drive a truck containing ready-mix concrete to job sites.  He was also responsible for inspecting,

maintaining, and cleaning his assigned truck, and for carrying, maneuvering, and attaching heavy cement chutes to the truck at job sites.

¶7 Wingra had two types of ready-mix trucks, "gliders" and "non-gliders," in its fleet. The glider trucks were older models that were equipped with cable-operated gas pedals and lacked shock absorbers. The non-glider trucks were newer models that were generally less physically demanding and more comfortable to drive. During Gilbertson's employment, only nine of the 50 to 65 trucks in Wingra's fleet were gliders, and the total number of trucks in the fleet was greater than the number of drivers Wingra employed.

¶8 Wingra's practice was to assign each of its drivers to a single truck. Gilbertson was assigned to "Truck 56," which was a glider truck.

¶9 In the late fall of 2012, Gilbertson began experiencing low back pain and fatigue, which he attributed at least in part to the mechanics of operating his assigned glider truck. He was laid off that winter and his pain improved. When Gilbertson resumed employment in the spring of 2013, his pain quickly returned, gradually worsening throughout the 2013 construction season. He experienced daily back pain as well as pain that radiated down his right leg, ankle, and foot, a loss of flexibility, "extreme soreness" and fatigue. Gilbertson could sleep for only two hours at a time, and he was taking 12 to 16 ibuprofen tablets a day to cope with the pain.

¶10 During this time, Gilbertson's pain limited his ability to work and the activities he could undertake at home. The mechanics of operating the accelerator in his assigned truck increased Gilbertson's pain levels, and he did not feel safe operating his truck. The pain made it difficult for Gilbertson to move

quickly and to keep up with work tasks, and he struggled to lift heavy objects, including the cement chutes at job sites.

¶11    In early June 2013, Gilbertson decided to speak with his managers about his health situation.  At that time, and throughout the remainder of Gilbertson's employment, Wingra had no written policy or procedure regarding disability accommodation requests.  Wingra did not provide any guidance or training to its employees on how to make such requests, nor did it provide any guidance or training to its managers on how to handle any requests that were made.  When Wingra's owner and president, Robert Shea, was asked about the absence of pertinent guidance or training at the contested case hearing, he testified, "I guess it's an oversight.…  You bring up an oversight in our [employee] manual."

¶12    Gilbertson first spoke with Wingra's dispatch manager, Amber Femrite, about the pain he was experiencing.  He expressed interest in pursuing a worker's compensation claim.

¶13    After that, on June 4, 2013, Gilbertson spoke with Wingra's safety and human resources manager, Greg Sundby.  Gilbertson told Sundby about his back and leg problems, and that they were getting progressively worse.  He told Sundby that he was having difficulty driving his assigned truck because of the problems he was experiencing, and he again expressed interest in filing a worker's compensation claim.

¶14    In response to Gilbertson's statement about a potential worker's compensation claim, Sundby told Gilbertson that worker's compensation insurance might not cover his medical care because it might be difficult to prove that his assigned truck was the cause of his problems.  Gilbertson did not have

health insurance at that time, and Sundby said that "he'd hate to get [Gilbertson] stuck with the medical bills." Sundby did not ask Gilbertson to see a doctor when they conversed on June 4, 2013, nor did Sundby request any documentation regarding the symptoms and limitations that Gilbertson was reporting. Indeed, although Gilbertson raised his physical condition with Wingra on more than one occasion in the months that followed, it is undisputed that no Wingra representative ever asked Gilbertson to provide medical evidence regarding his condition.

¶15    Shortly after the June 4, 2013 conversation, Gilbertson sent Sundby a text message stating that he did not wish to file a worker's compensation claim until he had health insurance. Gilbertson expressed concern about having to pay for his medical care if worker's compensation would not cover those costs.[1]

¶16    At some point during the summer of 2013, Gilbertson spoke with Femrite (the dispatch manager) to ask for a reassignment to a non-glider truck. Femrite told Gilbertson to consult with another Wingra employee to identify a suitable truck. The employee suggested "Truck 51," a non-glider that was not currently in use, and Gilbertson asked to be transferred to that truck. Femrite told him that the registration on Gilbertson's assigned glider truck would be expiring in

---

[1] Throughout its appellate briefing, Wingra asserts that Gilbertson "refused" to see a doctor. It is undisputed that Gilbertson did not see a doctor during his employment; however, as mentioned above, it is also undisputed that Wingra never asked Gilbertson to see a doctor or to provide medical evidence of his condition. LIRC found that Gilbertson declined to see a doctor for purposes of initiating a worker's compensation claim only after Sundby warned him that he might be stuck with the medical bills if he could not prove that his assigned truck was causing his physical problems. LIRC's finding is consistent with the evidence in the record, and there is no contrary evidence in the record.

September 2013 and, when it expired, Gilbertson could start driving the requested non-glider truck.

¶17     Around that same time, Wingra's operations manager, Andy Balch, spoke with Shea about Gilbertson's condition and his request to be reassigned to a non-glider truck. Balch told Shea that Gilbertson was complaining about foot pain and ankle soreness that he attributed to pressing the accelerator pedal in his assigned truck; that Gilbertson was having a difficult time pressing the accelerator throughout his shifts; and that Gilbertson had asked to be reassigned to a different truck.[2]

¶18     According to Shea's testimony at the contested case hearing, he and Balch decided to override Femrite's decision to reassign Gilbertson to a non-glider truck. Wingra had a longstanding policy of not allowing its drivers to switch truck assignments, and Balch did not believe that there was a reason to deviate from that policy. Shea further testified that, at the time Wingra denied Gilbertson's accommodation requests, he "saw no evidence" that Gilbertson's claimed impairment rose to the level of requiring a deviation from Wingra's policy, but Shea also acknowledged that Wingra never asked Gilbertson for any such evidence. Shea testified that it is not Wingra's "responsibility to draw medical information out of our employees, healthy or injured."

---

[2] During the contested case hearing, Balch denied knowledge of Gilbertson's physical condition and accommodation requests, but he was impeached by his prior deposition testimony and other evidence from the hearing. The administrative law judge determined that Balch was not a credible witness, and LIRC accepted this determination about Balch's credibility.

¶19    On September 11, 2013, Gilbertson learned that he would not be reassigned to the non-glider truck (Truck 51) as planned, and that he would have to continue driving his assigned glider truck (Truck 56). Gilbertson emailed Femrite asking her to reconsider a reassignment to Truck 51. He wrote:

> It was discussed between us that you would not renew 56 … and [that you would] register 51 at the end of September, which is when 56 expires, this way you were not adding an extra truck to your fleet.…
>
> A couple months ago I spoke with Greg Sundby about my ongoing extreme soreness, as mentioned above. The hours I work weekly and [the] fact is no secret [that] the gliders are rough riding/operating compared to others, and is contributing to my body pains. I have wanted to see my doctor, but still have no health insurance at this time, and [a reassignment to a non-glider truck] could be the simple solution.
>
> I'm asking you to reconsider.

One hour later, Gilbertson received Femrite's response indicating that, per Balch's instructions, Wingra would not be reassigning him to a different truck.

¶20    Shortly thereafter, Gilbertson forwarded Femrite's email to his union steward, adding the following:

> I do feel that Andy [Balch] is now discriminating based on all the reason[s] we have discussed in the past months. Body soreness has been brought to the attention of our Safety and [Human Resources] person[nel] months ago …. Many are well aware of the ride difference and health/body problems the gliders create, when running long weekly hours as we do, including Greg Sundby …. Some have been moved to non-gliders for the same reason.

Gilbertson copied Shea, Balch, and Femrite on this email.

¶21    There is no evidence in the agency record that Wingra took any action in response to this last email by Gilbertson. Nor is there any evidence that

8

any Wingra representative ever told Gilbertson that his request for a reassignment had been denied based on a lack of medical evidence establishing his need for an accommodation. LIRC specifically found that Gilbertson "was not advised that [Wingra] considered [the information] he had provided [about his condition or his need for accommodation] to be inadequate."

¶22 After learning that Balch had overridden Femrite's decision to reassign Gilbertson to a non-glider truck, Gilbertson altered a slogan on his hardhat so that it made a derogatory statement about Balch. Specifically, Gilbertson changed the slogan, which originally read "Don't be a Dick," to "Don't be an Andy." When Balch observed Gilbertson's hardhat, he became upset and directed another driver, Phillip Woerpel, to tell Gilbertson to remove the derogatory statement. Balch told Woerpel: "I know [Gilbertson] wants a different truck, but as far as I'm concerned, fuck it. He can haul concrete in a wheelbarrow." Balch continued: "I don't care how badly [Gilbertson's] hurt, he'll drive [his assigned truck] until hell freezes over."

¶23 Following the incident with the hardhat, Shea scheduled a September 30, 2013 meeting with Gilbertson and Balch to discuss the breakdown in their professional relationship. Gilbertson asked to have union representation at the meeting, and Wingra responded that union representation was not needed. During the meeting, Gilbertson mentioned that he was having trouble driving his truck due to medical issues. Shea responded that he did not know "what

[Gilbertson's] condition is," but that Wingra had "a great deal of investment in" Gilbertson's assigned truck and "need[s] to have it on the road."[3]

¶24    On October 22, 2013, Gilbertson arrived at a job site but was struggling to work due to pain.  Gilbertson returned to Wingra's office and placed his time card, fuel card, and truck key on Sundby's desk.  Sundby asked Gilbertson what was going on.  Gilbertson responded, "You know," and then walked out of Sundby's office.  Sundby followed Gilbertson outside and said that "he'd hate to see [Gilbertson] make a life changing decision" by quitting his job.  Gilbertson responded that he "never wanted to quit" and was "just asking for help" so that he could "operate [his truck] safely."

¶25    Sundby told Gilbertson that he would try to contact Shea, who was on vacation, and that Sundby would see what he could do to get Gilbertson into a

---

[3] As stated, LIRC expressly found that, during the September 30 meeting, Gilbertson mentioned that he was having problems driving his assigned truck due to medical issues.  Wingra asserts that this finding is not supported by any record evidence, but this assertion is incorrect.

To support its assertion that LIRC's finding is erroneous, Wingra quotes a portion of Gilbertson's testimony, but it ignores other testimony that provides the record support for LIRC's finding.  In the quoted portion, Gilbertson was asked whether there had been "no conversation" at the September 30 meeting "about [Wingra's] failure to reassign him" to a non-glider truck, and Gilbertson responded "correct."  However, based on other portions of the transcript, LIRC appears to have interpreted Gilbertson to mean that there had not been any meaningful conversation about Wingra's failure to reassign him to another truck, but that Gilbertson's medical issues were mentioned, albeit briefly, during the meeting.  More specifically, Gilbertson testified that his back pain "did come up" during the meeting, but that Shea "cut it off quickly," responding "I don't know what your condition is" and immediately switching the topic to Wingra's business needs.  At another point, Gilbertson testified that his request to be transferred to a different truck "came up" at the September 30 meeting, but that Shea "quickly diverted" the discussion to Wingra's business needs.  Wingra fails to support its challenge to LIRC's finding of fact.

non-glider truck.  Sundby handed Gilbertson his cards and key and told Gilbertson to let a dispatcher know that he was going home because he was in pain.

¶26     Gilbertson was scheduled to work at 7:30 a.m. the following day, October 23, 2013, but he did not report to work.  Gilbertson called Sundby at 9:30 a.m. to see if Sundby had spoken with Shea about reassigning him to a non-glider truck.  During this conversation, Gilbertson told Sundby that he would have to file a worker's compensation claim if he could not be reassigned to a different truck.

¶27     That afternoon, Gilbertson sent an email to Sundby, stating in relevant part:

> To recap what has been discussed on 10/22 and 10/23/13.  I turned my keys for truck 56, fuel and time card into you [after] working only 2 hours.  We discussed the reason, my … accumulative body soreness, and no efforts of getting me into a non-glider.…  We also discussed what was said in my meeting with Bob Shea recently, Bob indicated that he wants to keep me in the glider, due to the great deal of resources he has invested, ignoring my well-being and safety of others.  You mentioned you don't have approval to do so, but you would work on it, and also handed me all items back … telling me not to quit and to take some time to think about it. (I agreed)  Then you would see if you can get me into 51 or [an]other non-glider truck, but it might take a couple days to get approval, since Bob is out of town.  I mentioned this morning I'm willing to come to work today, if you can put me into … [an]other non-glider that is not being used, until 51 or [an]other can be assigned to me, you again indicated you don't have approval to do so.  We both agreed it makes sense to try this first as planned by Amber [Femrite] to aid in my accumulative condition.  If this is not considered, I will need to move forward as discussed and file a [worker's compensation] injury claim to seek medical attention (which may be needed anyway, if after operating a non-glider for a period of time doesn't aid in recovery.)

¶28    After receiving this email, Sundby sent the following email to Shea:

> Sorry to bother you on vacation. Mr. Gilbertson was told NOT to send e-mail messages anymore. Evidently that did not register with him. As badly as we need drivers, my decision would be to call him back and say that he is absolutely NOT getting a new truck, and that based on my conversation with him yesterday, we are accepting his resignation. I'm a little taken back by the threats. We can address the worker's compensation issue as it unfolds. P.S[.] I did not AGREE to anything with him. He is not at work today, and I would like to resolve this before he has a change of heart.

Shea agreed with Sundby's recommendations.

¶29    Sundby called Gilbertson and told him that he would not be reassigned to a non-glider truck; that Wingra was accepting Gilbertson's resignation; and that Wingra would send Gilbertson written confirmation that his employment had ended. Gilbertson told Sundby that he was not quitting. He later emailed Sundby, stating that he would not sign the resignation papers that had been prepared for him, and that he was available to work if Sundby could "place [him] in a non-glider to aid in [his] recovery."

¶30    Gilbertson did not return to his employment with Wingra after October 23, 2013. Despite attempts to find other employment, Gilbertson remained unemployed from late October 2013 until April 2018, when he accepted a position with a different employer.

¶31    Immediately following his separation of employment from Wingra, Gilbertson saw a doctor for the first time to address his pain. He first saw a primary care physician on or about October 28, 2013.

¶32    In July 2014, Gilbertson sought treatment from a chiropractor who diagnosed Gilbertson with chronic lower back pain due to multilevel degenerative

disc disease, right sciatic radiculopathy and right foot drop, and right sacroiliac joint dysfunction. The chiropractor assigned Gilbertson a seven percent permanent partial disability rating and issued a set of job restrictions.

¶33    Then in 2017, Gilbertson sought treatment from a spine specialist, Dr. Greenberg, who examined Gilbertson; reviewed his medical history; and reviewed the medical imaging he received in December 2013 and June 2015. Dr. Greenberg opined that Gilbertson suffered from several permanent physical impairments, including chronic pain syndrome, centralized pain syndrome, multilevel lumbar degenerative disc disease and stenosis, and lumbar radiculitis, and that Gilbertson's disability began in 2013, while he was employed by Wingra. Dr. Greenberg assigned Gilbertson a 10 percent permanent partial disability rating and opined that, had Wingra reassigned Gilbertson to a non-glider truck, the reassignment would have alleviated Gilbertson's pain symptoms such that he would have been able to perform the work of a ready-mix truck driver.

## Procedural History

¶34    This case has a lengthy procedural history. Gilbertson filed his first complaint with the state department of workforce development, equal rights division, in February 2014. Gilbertson alleged that Wingra refused to reasonably accommodate his disability, which resulted in the termination of his employment.

¶35    A department investigator was assigned to the case and, in February 2015, the investigator issued an initial determination that there was no probable cause that Wingra violated the Act. Gilbertson appealed and, in November 2015, a probable cause hearing was held before an administrative law judge, who dismissed the complaint for lack of probable cause. Gilbertson

appealed that determination to LIRC, which reversed the administrative law judge's dismissal order in January 2017.[4]

¶36   An administrative law judge held a hearing on the merits of Gilbertson's employment discrimination claims in September 2018 and issued a written decision in August 2019. According to the administrative law judge, Gilbertson established through credible evidence that he was an individual with a disability; that Wingra failed to accommodate that disability even though doing so would impose no hardship; and that Wingra terminated his employment. However, the administrative law judge determined that Wingra did not know whether Gilbertson's condition was a permanent disability during the term of his employment, and therefore, Gilbertson had not established that Wingra violated the Act.

¶37   Gilbertson appealed to LIRC in August 2019, which ultimately resulted in the decision that is the subject of our review. In summary and as further discussed below, LIRC concluded that Wingra violated the Act by refusing to reasonably accommodate Gilbertson's disability. It determined that Gilbertson is an individual with a disability, and that he had the disability at the time he was employed by Wingra. LIRC found that Gilbertson notified Wingra of the physical issues that he was experiencing; that he requested an accommodation to address those issues; and that, based on the information Gilbertson had provided, Wingra

---

[4] Gilbertson filed a second complaint in March 2017, which alleged additional discrimination claims. Specifically, he alleged that Wingra discriminated and retaliated against him by refusing to rehire him as a ready-mix truck driver. LIRC ultimately determined that Gilbertson failed to prove these claims and Gilbertson does not appeal this determination. We discuss the allegations in the second complaint no further.

should have been on notice that he was making a disability accommodation request. LIRC concluded that Gilbertson's requests triggered Wingra's duty to provide an accommodation—or at least to request further information from Gilbertson—but that Wingra "immediately and categorically" denied the request for business reasons. LIRC found that reassignment to a non-glider truck would have been an available accommodation, and it determined that it would have been a reasonable one. LIRC concluded that a reassignment would have permitted Gilbertson to remain employed as a ready-mix truck driver; that Wingra could have provided such an accommodation without hardship to its business; and that Wingra did not deny the request based on a belief that Gilbertson did not have a disability.

¶38  LIRC also determined that Gilbertson did not voluntarily resign his employment with Wingra, and that Wingra terminated his employment on October 23, 2013. After resolving the parties' dispute about whether Gilbertson adequately mitigated his damages, LIRC awarded Gilbertson back pay from October 23, 2013. It also awarded attorney fees in the amount of $162,125 and costs in the amount of $12,510.

¶39  Wingra timely petitioned for review in the circuit court, which affirmed LIRC's order. Wingra appeals.

## DISCUSSION

¶40  On appeal, we review the decision of the administrative agency rather than the decision of the circuit court. *Estate of Szleszinski v. LIRC*, 2007

15

WI 106, ¶22, 304 Wis. 2d 258, 736 N.W.2d 111. Our review is governed by WIS. STAT. § 111.395 (2021-22),[5] which provides that "[f]indings and orders of the [C]ommission under this subchapter are subject to review under ch. 227." Under WIS. STAT. § 227.57, we will affirm LIRC's decision unless Wingra establishes grounds for setting aside or modifying the decision, or for remanding to LIRC for further proceedings. *See* § 227.57(2), (5), (6), (8).

¶41 Our review of LIRC's factual findings is limited. ***Wisconsin Bell, Inc. v. LIRC***, 2018 WI 76, ¶30, 382 Wis. 2d 624, 914 N.W.2d 1. If LIRC's decision depends on any fact that it found in a contested case proceeding, we will not substitute our own judgment "as to the weight of the evidence on any disputed finding of fact." ***Id.*** (quoting WIS. STAT. § 227.57(6)). We will set aside the decision or remand to LIRC based on a factual deficiency only if the decision "depends on any finding of fact that is not supported by substantial evidence in the record." ***Id.*** (quoting § 227.57(6)). "Substantial evidence does not mean a preponderance of the evidence"—it instead means that, "after considering all evidence of record, reasonable minds could arrive at the [same] conclusion." ***Id.*** (quoting ***Milwaukee Symphony Orchestra, Inc. v. DOR***, 2010 WI 33, ¶31, 324 Wis. 2d 68, 781 N.W.2d 674). In other words, we will not set aside any of LIRC's findings of fact unless a reasonable fact finder "could not have [made those findings] from all of the evidence [in the record], including the available inferences from that evidence." ***Milwaukee Symphony Orchestra, Inc.***, 324 Wis. 2d 68, ¶31 (superseded by statute on other grounds).

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version.

¶42    By contrast, we will not defer to LIRC's conclusions of law.  *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶¶3, 84, 382 Wis. 2d 496, 914 N.W.2d 21. Although we give "due weight" to LIRC's experience, technical competence, and specialized knowledge as we consider its arguments, we review LIRC's legal conclusions de novo, including its interpretation and application of statutes.[6]  *Id.* If we conclude that LIRC "has erroneously interpreted a provision of law," we will set aside or modify its decision if "a correct interpretation compels a particular action," or we will remand the matter to LIRC "for further action under a correct interpretation of the provision of law."  *Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶29 (quoting WIS. STAT. § 227.57(5)).

---

[6] Throughout the briefing, the parties direct us to LIRC's prior decisions regarding the Wisconsin Fair Employment Act, and Wingra's brief refers to some of these decisions as establishing LIRC's "precedent" and "settled application" of the Act.  This framing is inapt. Decisions by state administrative agencies have never been considered to be binding precedent, and a recent decision by our supreme court ended the practice of giving any measure of deference to an agency's conclusions of law.  *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶¶3, 84, 382 Wis. 2d 496, 914 N.W.2d 21.  An agency's interpretation and application of a statute is not "settled" unless and until it has been incorporated into a published decision of an appellate court.  *See Wisconsin Bell, Inc. v. LIRC*, 2018 WI 76, ¶43, 382 Wis. 2d 624, 914 N.W.2d 1 (rejecting a "long-standing practice" by LIRC because it was not consistent with our supreme court's interpretation of the Act).  We have therefore considered the parties' citations to LIRC's prior decisions only when appropriate for purposes of giving due weight to LIRC's experience, technical competence, and specialized knowledge as we consider its arguments. *Tetra Tech EC, Inc.*, 382 Wis. 2d 496, ¶¶3, 84.

Separately, the parties also cite a number of federal decisions interpreting the federal Americans with Disabilities Act (the ADA).  Although Wisconsin courts may consider federal precedent when interpreting the Wisconsin Fair Employment Act, the language of the ADA and the Act differs in some significant respects, and Wisconsin courts are not bound by interpretations of the ADA when interpreting our own anti-discrimination laws.  *See Hamilton v. DILHR*, 94 Wis. 2d 611, 620 n.4, 288 N.W.2d 857 (1980); *Crystal Lake Cheese Factory v. LIRC*, 2003 WI 106, ¶46, 264 Wis. 2d 200, 664 N.W.2d 651.  Accordingly, we consider the parties' citations to federal decisions only to the extent they provide helpful guidance for our independent interpretation of the Act, and only if the decisions do not conflict with the Wisconsin legislature's intent in enacting the Act.  *Marten Transp., Ltd. v. DILHR*, 176 Wis. 2d 1012, 1020-21, 501 N.W.2d 391 (1993).

¶43    In this case, Wingra asserts that LIRC erred in concluding that Wingra violated the Act by refusing to reasonably accommodate Gilbertson's disability.    Wingra also challenges LIRC's determination that it terminated Gilbertson's employment, and it argues that LIRC should have found that Gilbertson voluntarily resigned.  Finally, Wingra takes issue with various aspects of LIRC's award of back pay and attorney fees.

¶44    To provide a framework for our discussion, we begin by briefly summarizing Wisconsin law governing employment discrimination on the basis of disability.  We then address Wingra's arguments in turn.

### I.  Disability Discrimination Under the Act

¶45    The    Wisconsin    Fair    Employment    Act,    WIS.    STAT. §§ 111.31-111.395,    addresses    "the    practice    of    unfair    discrimination    in employment against properly qualified individuals."    *See* § 111.31(1); *see also* §§  111.321, 111.325.  One stated purpose of the Act is to "encourage and foster to the fullest extent practicable the employment of all properly qualified individuals," and ambiguous provisions in the Act "shall be liberally construed for the accomplishment of this purpose."  *See* § 111.31(3); *see also* ***McMullen v. LIRC***, 148 Wis. 2d 270, 275, 434 N.W.2d 830 (Ct. App. 1998); ***Amazon Logistics, Inc. v. LIRC***, 2023 WI App 26, ¶¶25-26, 407 Wis. 2d 807, __N.W.2d __.

¶46    The  Act  begins  with  a  general  prohibition  against  "act[s]  of employment discrimination" on the basis of certain characteristics identified in

WIS. STAT. § 111.321.[7]   Throughout this opinion, we refer to these statutorily enumerated characteristics as "protected characteristics," and to individuals with those protected characteristics as belonging to a "protected class." *See Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶33 (using the term "protected class" in reference to classes of individuals protected by § 111.321); *Racine Unified Sch. Dist. v. LIRC*, 164 Wis. 2d 567, 595, 476 N.W.2d 707 (Ct. App. 1991) (same).   One protected characteristic is disability, and individuals with disabilities belong to a protected class.

¶47   There are two separate statutory sections, WIS. STAT. § 111.322 and WIS. STAT. § 111.34, that identify different prohibited "acts of employment discrimination" on the basis of disability.

¶48   The first such section, WIS. STAT. § 111.322, is titled "Discriminatory actions prohibited."[8]   That section applies generally to all of the

---

[7] *See* WIS. STAT. § 111.321 ("Subject to ss. 111.33 to 111.365, no employer … may engage in any act of employment discrimination as specified in s. 111.322 … on the basis of age, race, creed, color, disability, marital status, sex, national origin, ancestry, arrest record, conviction record, military service, use or nonuse of lawful products off the employer's premises during nonworking hours, or declining to attend a meeting or to participate in any communication about religious matters or political matters.").

[8] WISCONSIN STAT. § 111.322 provides in relevant part:

> Subject to ss. 111.33 to 111.365, it is an act of employment discrimination to do any of the following:
>
> (1) To refuse to hire, employ, admit or license any individual, to bar or terminate from employment or labor organization membership any individual, or to discriminate against any individual in promotion, compensation or in terms, conditions or privileges of employment or labor organization membership because of any basis enumerated in s. 111.321.

protected characteristics enumerated in WIS. STAT. § 111.321 (which, as mentioned, includes disability). It identifies certain adverse employment actions (such as termination from employment and refusing to hire or promote) that, when taken on the basis of a protected characteristic, constitute "act[s] of employment discrimination." *See* § 111.321. As pertinent here, § 111.322(1) states that it is an act of employment discrimination "to … terminate from employment … any individual … because of any basis enumerated in s. 111.321."

¶49 The second such section, WIS. STAT. § 111.34, is titled "Disability; exceptions and special cases."[9] Section 111.34 sets forth additional acts of employment discrimination that specifically pertain to individuals with disabilities, and it also sets forth certain defenses to disability discrimination claims. As pertinent here, § 111.34(1)(b) states that "[e]mployment discrimination

---

[9] WISCONSIN STAT. § 111.34 provides in relevant part:

> (1) Employment discrimination because of disability includes, but is not limited to:
>
> (a) Contributing a lesser amount to the fringe benefits, including life or disability insurance coverage, of any employee because of the employee's disability; or
>
> (b) Refusing to reasonably accommodate an employee's or prospective employee's disability unless the employer can demonstrate that the accommodation would pose a hardship on the employer's program, enterprise or business.

WISCONSIN STAT. § 111.34(2)(a) goes on to provide that, notwithstanding WIS. STAT. § 111.322, "it is not employment discrimination because of disability" to take an action enumerated in § 111.322(1) "if the disability is reasonably related to the individual's ability to adequately undertake the job-related responsibilities of that individual's employment," and § 111.34(2)(b) and (c) identify factors to consider in evaluating whether any employee can "adequately undertake the job-related responsibilities of a particular job." We do not address these paragraphs further because Wingra does not rely on § 111.34(2) to defend against Gilbertson's claim.

because of disability includes, but is not limited to: [r]efusing to reasonably accommodate an employee's … disability."

¶50 Based on these statutory provisions, Wisconsin cases recognize two distinct theories of disability-based employment discrimination that are pertinent to our analysis of this case: disparate treatment and refusal to accommodate.[10] *Contrast* **Wisconsin Bell, Inc.**, 382 Wis. 2d 624, ¶33 (addressing the "disparate treatment theory" of disability discrimination) *with* **id.**, ¶53 n.22 (acknowledging that an employer's refusal to accommodate an employee's disability is a separate theory, which the employee and **Wisconsin Bell** declined to pursue on appeal). Under a disparate-treatment-based theory, the crux of the claim is that the employer treated the employee less favorably than others because the employee has a disability. *See* **id.**, ¶33 (citing **Racine Unified Sch. Dist.**, 164 Wis. 2d at 595). By contrast, under an accommodation-based theory, the crux of the claim is that the employer could have reasonably accommodated the employee's disability but refused to do so. *See* **Hutchinson Tech., Inc. v. LIRC**, 2004 WI 90, ¶¶20-36, 273 Wis. 2d 394, 682 N.W.2d 343; *see also* **Wisconsin Bell, Inc.**, 382 Wis. 2d 624, ¶53 n.22.

¶51 Although these are two distinct theories of liability, an employer's failure to accommodate an employee's disability often goes hand in hand with an

---

[10] This dichotomy is similar to one found in federal cases interpreting the ADA. *See, e.g.*, **Bunn v. Khoury Enterprises, Inc.**, 753 F.3d 676, 682, 683 (7th Cir. 2014) (separately addressing an employee's reasonable accommodation claim and his disparate treatment claim); *see also EEOC Guidance CM-604 Theories of Discrimination*, https://www.eeoc.gov/laws/guidance/cm-604-theories-discrimination.

adverse employment action such as a discharge from employment.[11]   *See Hutchinson Tech., Inc.*, 273 Wis. 2d 394, ¶35; *see also Stoughton Trailers, Inc. v. LIRC*, 2007 WI 105, ¶23, 303 Wis. 2d 514, 735 N.W.2d 477; *Crystal Lake Cheese Factory v. LIRC*, 2003 WI 106, ¶¶10, 13, 264 Wis. 2d 200, 664 N.W.2d 651; *Target Stores v. LIRC*, 217 Wis. 2d 1, 9, 576 N.W.2d 545 (Ct. App. 1998). In such cases, it is not always clear whether the employee's employment discrimination case should be characterized as a single claim based on the employer's refusal to accommodate the employee's disability, a single claim based on a discriminatory adverse employment action, or two separate claims, one for refusal to accommodate and a second for a discriminatory adverse employment action.

¶52   In situations like this one, in which the employee claims that the employer refused to accommodate the employee's disability prior to taking the adverse employment action, our supreme court has analyzed the employee's cause of action based on a refusal to accommodate theory.[12]   *See Hutchinson Tech.,*

---

[11] We have not identified any Wisconsin appellate opinion in which an employer's refusal to accommodate an employee's disability did not also involve an adverse employment action enumerated in WIS. STAT. § 111.322, such as a discharge from employment. This case does not involve an issue that has arisen under the ADA—whether an employer's refusal to accommodate an employee's disability is actionable if it is not followed by one of the adverse employment actions that are enumerated in § 111.322 and the employee does not seek the remedies available for such adverse employment actions, such as reinstatement and back pay. *Compare EEOC v. AutoZone, Inc.*, 630 F.3d 635, 638 n. 1 (7th Cir. 2010) (an adverse employment action is not required to prove a failure to accommodate claim) *with Fenney v. Dakota, Minnesota & E. R.R. Co.*, 327 F.3d 707, 716-17 (8th Cir. 2003) (requiring proof of an adverse employment action as a part of employee's prima facie failure to accommodate claim).

[12] *Cf. Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶53 n.22 (providing that, in cases in which the employee does not claim that the employer refused to accommodate the employee's disability prior to the adverse employment action, the claim is analyzed as a disparate treatment claim).

*Inc.*, 273 Wis. 2d 394, ¶¶20-36; *Crystal Lake Cheese Factory*, 264 Wis. 2d 200, ¶¶1-3. Back pay is an available remedy in such cases, provided that it is necessary to make the employee whole. *See* WIS. STAT. § 111.39(4)(c) (back pay can be awarded if an employer "has engaged in discrimination" and back pay "will effectuate the purpose" of the Act); *see also Crystal Lake Cheese Factory*, 264 Wis. 2d 200, ¶16 n.6.

¶53     In such cases, when the employer's refusal to accommodate is followed by an adverse employment action enumerated in WIS. STAT. § 111.322 and the employee seeks a remedy for that adverse employment action, our cases establish that the employee has the initial burden to prove that the employee is an "individual with a disability" within the meaning of WIS. STAT. § 111.32(8), *id.*, ¶42; that the employer took one of the actions enumerated in § 111.322(1), *id.*; and that a reasonable accommodation was available that the employer refused to provide, *Hutchinson Technology, Inc.*, 273 Wis. 2d 394, ¶35. If the employee proves the above elements, the burden shifts to the employer to prove a defense under WIS. STAT. § 111.34(1)(b) or (2)(a)—that making an accommodation would pose a hardship on the employer's program, enterprise, or business; or that, even with reasonable accommodation, the employee would be unable to undertake the job-related responsibilities of their employment. *Crystal Lake Cheese Factory*, 264 Wis. 2d 200, ¶43; *Hutchinson Tech., Inc.*, 273 Wis. 2d 394, ¶35.

## II.  Wingra's Arguments About WIS. STAT. § 111.34(1)(b)

¶54     With this framework in mind, we turn to Wingra's challenge to LIRC's conclusion that it violated WIS. STAT. § 111.34(1)(b). Wingra contends that, under the factual circumstances of this case, it did not have an obligation to accommodate Gilbertson's disability and cannot be liable for failing to do so.

Wingra advances various arguments to support this contention, but they are all variations on a single theme—the fact that Gilbertson was not diagnosed with a disability until 2014, after his employment with Wingra had ended, forecloses any liability Wingra could have for refusing to accommodate his disability. This is because, Wingra contends, "the absence of any medical information or documentation forecloses a conclusion that either Gilbertson or Wingra was aware of Gilbertson's disability during his employment."

¶55 To this end, Wingra's specific arguments are as follows. First, Wingra argues that LIRC erred in concluding that Gilbertson was an "individual with a disability" at the time he was employed by Wingra because Gilbertson did not have a disability diagnosis at that time. Second, Wingra argues that an employer's "discriminatory intent" is an element in refusal-to-accommodate cases such as this, and that Wingra lacked such intent because it was not presented with a contemporaneous diagnosis or other contemporaneous medical evidence. Therefore, Wingra contends, it could not have known that Gilbertson was disabled and required an accommodation. Separately, Wingra also challenges LIRC's determination that it terminated Gilbertson's employment, and we discuss that challenge in section III of this opinion.

### A. Individual With a Disability

¶56 As stated, the first element that an employee must prove in a disability discrimination case is that the employee is an "individual with a disability," as that term is defined by WIS. STAT. § 111.32(8). Wingra challenges LIRC's conclusion that Gilbertson met his burden to prove this element.

¶57 WISCONSIN STAT. § 111.32(8) defines an "individual with a disability" as "an individual who: (a) Has a physical or mental impairment which

makes achievement unusually difficult or limits the capacity to work; (b) Has a record of such impairment; or (c) Is perceived as having such an impairment." Whether an employee is an "individual with a disability" is a question of law that we review de novo, *Hutchinson Technology, Inc.*, 273 Wis. 2d 394, ¶10, but we will uphold the factual findings LIRC made in support of this legal conclusion if the findings are supported by substantial evidence, *La Crosse Police and Fire Commission v. LIRC*, 139 Wis. 2d 740, 765, 407 N.W.2d 510 (1987).

¶58 As our supreme court has explained, an employee must make two showings to prove that the employee has a disability within the meaning of the Act. *Hutchinson Tech., Inc.*, 273 Wis. 2d 394, ¶15. First, the employee must demonstrate that they have an actual or perceived impairment, meaning an actual or perceived "lessening, or deterioration or damage to a normal bodily function or bodily condition" or "the absence of such [a normal] bodily function or bodily condition." *Id.*, ¶¶15-16 (citing *La Crosse Police and Fire Comm'n*, 139 Wis. 2d at 761). Second, the employee must demonstrate that this impairment "makes, or is perceived as making, achievement unusually difficult or limits [the employee's] capacity to work." *Hutchinson Tech., Inc.*, 273 Wis. 2d 394, ¶15. An impairment makes "achievement unusually difficult" if it substantially limits normal life functions or major life activities, and an impairment "limits the capacity to work" if it limits the employee's capacity to perform the job in question. *Id.*, ¶17.

¶59 Additionally, in a decision that was issued the year after *Hutchinson Technology*, this court stated that, under WIS. STAT. § 111.32(8), the employee's impairment must be "permanent." *See Erickson v. LIRC*, 2005 WI App 208, ¶¶15-16, 287 Wis. 2d 204, 704 N.W.2d 398. Although no permanency requirement was set forth in *Hutchinson Technology*, and although imposing such

a requirement would add language to the statute's definition, none of the parties in this case have questioned the correctness of the *Erickson* court's legal conclusion. For purposes of this opinion, we assume without deciding that the interpretation of § 111.32(8) that emerged from ***Erickson*** is correct.[13]

¶60 Here, based on Gilbertson's testimony and the undisputed medical evidence presented during the contested case hearing, LIRC determined that Gilbertson currently has a disability, as that term is defined by WIS. STAT. § 111.32(8)(a), and also that "he had that disability at the time he worked for [Wingra]." More specifically, LIRC found that Gilbertson "has a variety of physical impairments related to his spine, including but not limited to degenerative disc disease," which is "a permanent disabling condition." LIRC found that, at the time he worked for Wingra, those impairments substantially interfered with his ability to perform everyday functions and substantially limited his capacity to

---

[13] The ***Erickson*** court's conclusion that WIS. STAT. § 111.32(8) imposes a permanency requirement was based on the court giving great weight deference to LIRC's prior interpretations of that statute and the doctrine of legislative acquiescence. ***Erickson v. LIRC***, 2005 WI App 208, ¶¶15-18, 287 Wis. 2d 204, 704 N.W.2d 398. The ***Erickson*** court's analysis was limited to the following:

> For over twenty years, [LIRC] has interpreted the term "disability" within the [Act] to require a permanent impairment. Had our legislature considered this an inappropriate reading of the statute, it could have revised the language to include temporary impairments. We will not impose a new interpretation where our legislature has seen fit to let the statutory language, as applied by [LIRC], stand.

*Id.*, ¶16. We observe that the ***Erickson*** court's method of interpreting the statute would no longer be tenable under Wisconsin law. *See **Tetra Tech EC, Inc.***, 382 Wis. 2d 496, ¶¶3, 84 (abandoning the practice of giving deference to agencies' legal conclusions); *see also **Amazon Logistics, Inc. v. LIRC***, 2023 WI App 26, ¶130, 407 Wis. 2d 807, ___ N.W.2d ___ (explaining that the legislative acquiescence doctrine does not apply to legislative inaction following an administrative agency's interpretation of a statute).

work for Wingra. Based on all of these findings, LIRC concluded that Gilbertson was an individual with a disability during his employment, even though he was not examined by a medical professional and did not receive a disability diagnosis until after his employment with Wingra had come to an end. In reaching this conclusion, LIRC rejected Wingra's argument that an employee must have had a disability diagnosis at the time of the alleged act of employment discrimination to establish that the employee is an "individual with a disability" under § 111.32(8)(a).

¶61 Wingra does not challenge the majority of these factual and legal determinations on appeal. It does not challenge LIRC's determination that Gilbertson currently has a disability, as defined under WIS. STAT. § 111.32(8)(a). Nor does Wingra challenge LIRC's determination that, at the time Gilbertson was employed by Wingra, he had permanent physical impairments that made achievement unusually difficult and limited his capacity to work.

¶62 Wingra's sole challenge is to LIRC's conclusion that, to satisfy the employee's burden of proof under WIS. STAT. § 111.32(8)(a) at the contested case hearing, an employee is not required to have obtained a disability diagnosis contemporaneously to the alleged act of employment discrimination. Wingra contends that Gilbertson must prove that he had a disability at the time he was employed by Wingra, and that he cannot do so because he did not have a diagnosis that confirmed his disability at that time.

¶63 We agree with Wingra in one limited sense—at the contested case hearing, Gilbertson was required to prove that he had a disability at the time he was employed by Wingra.

¶64   However, Wingra's argument that a contemporaneous diagnosis was required to satisfy that burden of proof does not square with any statutory language in the Act.  As discussed, WIS. STAT. § 111.32(8) provides three definitions of disability, and the definition at issue in this case is a "physical or mental impairment" that "makes achievement unusually difficult or limits the capacity to work."  *See* § 111.32(8)(a).  The unambiguous language of paragraph (8)(a) does not require an impairment to be diagnosed at the time the employee is employed in order to satisfy the employee's burden at the evidentiary hearing.

¶65   Wingra makes two general arguments in support of its position that, despite the statutory language, a contemporaneous diagnosis is required.  Wingra first cites to ***Erickson***, which states that, in at least some cases, an employee must present competent medical evidence of an impairment during a contested case hearing.[14]  *See **Erickson***, 287 Wis. 2d 204, ¶¶17-19.  This aspect of ***Erickson*** lends no support to Wingra's argument.  ***Erickson*** discusses what an employee must do to satisfy the employee's burden of proof at a contested case hearing (which, in many cases, will occur after the employment has ended).  *See **id.***, ¶18 (concluding that Erickson was not an individual with a disability because he presented "no medical evidence on his behalf, either in the form of physician testimony or competent medical records" at the contested case hearing).  Here, Gilbertson satisfied his burden of proof at the contested case hearing by presenting

---

[14] ***Erickson*** involved a situation in which the physical limitations caused by back pain might or might not have constituted a disability as that term has been defined by LIRC.  There could be other situations in which an employee's disability is so obvious that no medical evidence is required.

the undisputed medical evidence summarized above. ***Erickson*** does not stand for the proposition that an employee must have presented medical evidence to their employer during the term of their employment to qualify as "an individual with a disability" as defined by WIS. STAT. § 111.32(8).[15]

¶66    Wingra also argues that, because only a medical provider can determine whether an employee's impairment is permanent, neither Wingra nor Gilbertson could have known at the time of his employment whether his "alleged lower body pain" was a temporary symptom or a permanent condition constituting a disability.    And Wingra cites ***Wisconsin Bell*** for the proposition that an employer must be aware of the causal connection between an employee's symptoms and the employee's disability to be liable for terminating the employee because of their disability. *See **Wisconsin Bell, Inc.***, 382 Wis. 2d 624, ¶¶41, 44, 50.

¶67    The premise underlying Wingra's argument—that an employer must have known that the employee had a disability for the employee to meet the employee's initial burden of proof under WIS. STAT. § 111.32(8)(a)—is unfounded.    Wingra points to no case that has considered an employer's knowledge when assessing whether an employee met their burden of proof on this element at the evidentiary hearing.    An employer's knowledge may be relevant when assessing whether an employer refused to reasonably accommodate an employee's disability, as we discuss in the following section of this opinion, but it

---

[15] Wingra also cites to prior decisions by LIRC, but the majority of these agency decisions stand for the unremarkable proposition that, if the employee cannot prove their disability at the contested case hearing, the employee cannot recover for disability discrimination under the Act.

is not relevant to an assessment of whether the employee is an individual with a disability.

¶68    For all of these reasons, we conclude that LIRC did not erroneously interpret any provision of law when it determined that Gilbertson proved he had a disability during his employment with Wingra based on evidence that was created by a medical professional after his employment had ended.

## B.  Refusal to Reasonably Accommodate

¶69    We now turn to LIRC's conclusion that Wingra refused to reasonably accommodate Gilbertson's disability.  Wingra's arguments concern the knowledge and level of certainty an employer must have before it faces potential liability for refusing to accommodate an employee's disability, and whether Wingra possessed the requisite knowledge in this case.

¶70    More specifically, Wingra first argues that proof of discriminatory intent is required in all discrimination cases, including refusal-to-accommodate cases, and that LIRC erred in concluding otherwise.  It further argues that an employer does not "refuse" to accommodate an employee's disability unless the employer knows that the employee is an individual with a disability as that term is defined in the Act.  Wingra argues that, for an employer to possess such knowledge, the employee must present the employer with competent medical evidence in the form of a disability diagnosis alongside any accommodation request.  Wingra contends that, if the employee does not provide such evidence, the employer is not legally required to provide an accommodation.  We address Wingra's arguments in turn.

## 1. Discriminatory Intent

¶71     We begin with Wingra's argument about discriminatory intent. Wingra takes issue with LIRC's determinations that refusal-to-accommodate cases under WIS. STAT. § 111.34(1)(b) do not "require a finding of discriminatory motivation or intent," and that Wingra's "lack of deliberate intent to discriminate does not provide a defense" to Gilbertson's claim.

¶72     Before considering Wingra's arguments on this point, we pause to consider the meaning of the term "discriminatory intent." The parties do not define the term in their briefing and, at times, they appear to use that term imprecisely.

¶73     Wisconsin cases use the term "discriminatory intent" when addressing disparate treatment claims under WIS. STAT. § 111.322(1). *See Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶33 (citing *Racine Unified Sch. Dist.*, 164 Wis. 2d at 594-95). In a disparate treatment claim, the employee must establish that their employer treated them less favorably than others by taking an adverse employment action identified in § 111.322(1) "because of" the employee's protected characteristic. *Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶34. Our cases sometimes use the term "discriminatory intent" (or sometimes "discriminatory animus") as shorthand to refer to the requirement that an adverse employment action was taken "because of" a protected characteristic. *Id.*, ¶¶33, 34.

¶74     To show that an employer took an adverse employment action "because of" an employee's protected characteristic, the employee must show that the employer was aware that the employee belonged to a protected class. *Id.*, ¶33; *see also id.*, ¶37 ("Ignorance of an employee's disability must certainly foreclose a finding of intentional discrimination."). Additionally, the employee must show

31

that the adverse employment action was motivated, at least in part, by their protected characteristic. *See* **Hoell v. LIRC**, 186 Wis. 2d 603, 608-609, 522 N.W.2d 234 (Ct. App. 1994) (describing the in-part standard, its application in mixed motive cases, and the remedies available in such cases). Accordingly, "discriminatory intent" has two facets that must be present at the time of the adverse employment action—the employer's *awareness* of an employee's protected characteristic, and also its *motivation to act based on* the protected characteristic. **Wisconsin Bell, Inc.**, 382 Wis. 2d 624, ¶¶44, 51.

¶75 Although Wingra argues that LIRC erroneously concluded that an employer's lack of "discriminatory intent" is not a defense to a refusal-to-accommodate claim, Wingra's arguments solely concern the *awareness* facet of discriminatory intent. That is, Wingra contends that an employer is not "capable of intentional discrimination" if the employer does not know that the employee has a disability.

¶76 To the extent that Wingra's argument is confined to the awareness facet of discriminatory intent, we agree with the general proposition that an employer must have some level of awareness of an employee's disability and need for accommodation before the employer can be liable for refusing to reasonably accommodate the employee's disability. That requirement is baked into the statutory language. WISCONSIN STAT. § 111.34(1)(b) is directed at those employers who "refuse" to accommodate an employee's disability, not those who merely "fail" to do so. An employer cannot "refuse" to accommodate an employee's disability if the employer is unaware that the employee has a disability. *See* § 111.34(1)(b); *see also* **Wisconsin Bell, Inc.**, 382 Wis. 2d 624, ¶53 n.22 (quoting a LIRC decision for the proposition that "an employer is not required to raise the issue of accommodation if the employer is unaware of an

employee's [disability]").  We discuss the requisite level of knowledge and certainty at length in the next section of this opinion.

¶77    However, to the extent that Wingra's argument goes further, arguing that the employer's refusal to accommodate must be based on a *discriminatory motive*, we disagree for the reasons we now explain.

¶78    Wingra argues that, because proof of a discriminatory motive is required for disparate treatment claims under WIS. STAT. § 111.322(1), *see id.*, ¶33, it must also be required for refusal-to-accommodate claims under WIS. STAT. § 111.34(1)(b).    However, the language of these two provisions differs in significant ways, and the text of § 111.34(1)(b) does not support an argument that proof of discriminatory motive is required in refusal-to-accommodate cases.

¶79    As noted, WIS. STAT. § 111.322(1) prohibits an employer from taking certain actions "because of" an employee's disability, and Wisconsin cases have interpreted that language to require proof that the employer treated the employee "less favorably than others because they [have a disability]."  *See Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶33.    By contrast, WIS. STAT. § 111.34(1)(b) states that, unless the employer can demonstrate that the accommodation would cause hardship, "[e]mployment discrimination because of disability includes … [r]efusing to reasonably accommodate an employee's … disability."  In other words, the language of § 111.34(1)(b) unequivocally provides that an employer discriminates "because of disability" if the employer refuses to reasonably accommodate an employee's disability.

¶80    Contrary to Wingra's argument, the phrase "because of disability" in WIS. STAT. § 111.34(1)(b) is not a separate element that an employee such as Gilbertson must establish to prevail on a refusal-to-accommodate claim.  Rather,

that phrase is included in § 111.34(1)(b) in order to link an employer's refusal to accommodate to the general prohibition on disability discrimination found in WIS. STAT. § 111.321. The language of § 111.34(1)(b) does not contemplate that, to be actionable, a "refus[al] to reasonably accommodate" a disability must also be motivated "because of" a desire to treat disabled persons less favorably than others, or "because of" their membership in a protected class.[16]

¶81 Nor does Wisconsin case law support the proposition that proof of discriminatory motive is required for refusal-to-accommodate claims under WIS. STAT. § 111.34(1)(b). Wingra does not identify any precedential Wisconsin case that has addressed whether an employee must prove that their employer refused to accommodate their disability "because of" any particular motivation. Wingra points to *Wisconsin Bell*, but that case was a disparate treatment case and did not involve any claim that the employer refused to accommodate the employee's

---

[16] Wingra also relies on LIRC's interpretation of a separate statute, WIS. STAT. § 111.36(1)(c), which provides that "[e]mployment discrimination because of sex includes … discriminating against any woman on the basis of pregnancy … by engaging in any of the actions prohibited under s. 111.322." Wingra argues that LIRC has interpreted § 111.36(1)(c) to require proof of a discriminatory intent and, therefore, the reasonable accommodation statute, WIS. STAT. § 111.34(1)(b), also must require proof of discriminatory intent. We disagree.

Wingra's argument is based on the flawed premise that WIS. STAT. § 111.36(1)(c) and WIS. STAT. § 111.34(1)(b) share the same structure and therefore must be interpreted to mean the same thing. However, the structure of the two statutes differs in significant ways. The pregnancy-based discrimination claim described in § 111.36(1)(c) provides that it is "employment discrimination because of sex" to take certain actions "on the basis of pregnancy." In other words, § 111.36(1)(c) describes a disparate treatment claim, which can be brought if an employer treats an employee differently "on the basis" of pregnancy. Therefore, it is not surprising that LIRC has interpreted claims under § 111.36(1)(c) to require proof of a discriminatory intent. By contrast, the reasonable accommodation statute, § 111.34(1)(b), provides that it is "employment discrimination because of disability" to refuse to reasonably accommodate an employee's disability, but it does not require that an employer's refusal to accommodate must be "because of" or "on the basis of" the disability.

disability. ***Wisconsin Bell, Inc.***, 382 Wis. 2d 624, ¶53 & n.22. ***Wisconsin Bell*** does not purport to address the elements or required proof for refusal-to-accommodate claims, except to say that "an employer is not required to raise the issue of accommodation if the employer is unaware of an employee's [disability]." ***Id.***, ¶53 n.22.

¶82 In summary, an employee alleging a violation of WIS. STAT. § 111.34(1)(b) must prove that their employer "refused" to reasonably accommodate the employee's disability. We have concluded that this requires proof that the employer had some level of knowledge of the employee's disability, but that it does not require proof that the employer refused to accommodate their disability "because of" any particular motivation.

## 2. Requisite Knowledge

¶83 We now consider the knowledge an employer must have regarding an employee's disability to be liable for refusing to accommodate it and whether LIRC correctly determined that Wingra possessed that knowledge at the relevant times in this case. LIRC's determination was based on the evidence presented at the contested case hearing and the following factual findings, which Wingra does not meaningfully dispute.

¶84 As mentioned, LIRC found that Gilbertson told Wingra on several occasions that he was suffering from persistent, ongoing, and progressive back, foot, and leg pain that was limiting his capacity to work. Gilbertson did not use the word "disability" or "accommodation," but he specifically told Wingra that his pain was interfering with his ability to safely drive his assigned truck and to keep up with work tasks, and he proposed reassignment to a non-glider truck as an accommodation on several occasions.

¶85     LIRC further found that, although Wingra "was well aware of the fact that [Gilbertson's assigned truck] was causing him pain," Wingra's response was to "immediately and categorically deny[]" Gilbertson's requests for an accommodation.  Wingra told Gilbertson that it was denying his accommodation requests for a business reason—it had a great deal of investment in Gilbertson's assigned glider truck and wanted it on the road.  Wingra did not communicate to Gilbertson that the reason it denied his request was because it considered the information Gilbertson provided inadequate to establish that he had a disability.  Indeed, LIRC specifically found that "the record … contains no evidence to suggest that [Wingra] denied [Gilbertson] the accommodation he requested based upon a belief that he did not have a disability," and that "the only reason [Gilbertson] was not assigned to a new truck was because [Wingra] has a policy of not changing truck assignments."

¶86     Based on these facts, LIRC determined that the information Gilbertson reported to Wingra "should have triggered an inquiry into whether [Gilbertson] was requesting a disability accommodation."  It concluded that Wingra's reliance on a lack of knowledge about Gilbertson's disability was "questionable," and that Wingra "clearly had the information that would have led it to discover that Gilbertson had a disability had it not foreclosed further discussion."  Under these factual circumstances, LIRC found that Gilbertson was not responsible for any doubt that Wingra could have had about whether his reported medical issues constituted a disability because Wingra provided no guidance on how to make a disability accommodation request; never asked Gilbertson for further information or proof; never told Gilbertson that it considered the information Gilbertson provided to be insufficient to establish that

Gilbertson had a disability; and foreclosed further discussion by immediately and categorically denying his requests.

¶87    Wingra challenges LIRC's determination that it had sufficient knowledge of Gilbertson's disability and need for an accommodation to be found liable under WIS. STAT. § 111.34(1)(b).  The premise of Wingra's argument is that an employer does not have any legal obligation to accommodate an employee's disability unless and until the employer is given medical evidence documenting that the employee has a disability within the meaning of the Act.  According to Wingra, it was not enough for Gilbertson to describe his back, foot, and leg pain and request an accommodation because symptoms may or may not be indicative of a medical condition, and not all medical conditions are disabilities.  Wingra contends that it was not required to "infer" that Gilbertson's condition might be a disability based on his description of symptoms that limited his capacity to work, and that it had no "responsibility to request [additional] information" from Gilbertson that "might lead to an accommodation."

¶88    We begin by observing that the statutory language is silent regarding the specific knowledge that an employer must have of an employee's disability to face liability for refusing to accommodate it.  As discussed, WIS. STAT. § 111.34(1)(b) provides that an employer may be liable for "[r]efusing to reasonably accommodate an employee's … disability," and we have determined that the word "refuse" requires some level of awareness.  However, as pertinent here, there is nothing in § 111.34(1)(b) that clarifies the rights and obligations of employers and employees in a situation like this one, in which the employee has provided factual information about a physical limitation that could reasonably lead an employer to conclude that the employee has a disability that requires accommodation, but not enough information to conclusively prove that the

37

physical condition constitutes a disability, as a claimant must do at an evidentiary hearing. There is a gap in the statutory language, and that gap could be interpreted to require anything from a low level of suspicion to absolute certainty.

¶89 Wisconsin case law provides some limited guidance on this topic. This court has stated that an employer must have "the information necessary for [the employer] to recognize that [the employee] need[s] [an] accommodation." *See Target Stores*, 217 Wis. 2d at 10. The information that is "necessary" for an employer to "recognize" that an employee needs an accommodation will depend on the facts of a given case, and the *Target Stores* court referred to this determination as a finding of fact. *Id.* at 11.

¶90 Wingra points to *Erickson* and *Wisconsin Bell* as support for its argument that a medical diagnosis is necessary information. However, neither of those opinions support Wingra's interpretation of WIS. STAT. § 111.34(1)(b).

¶91 As for *Erickson*, Wingra cites the portions of that opinion that we have already discussed. *See supra*, ¶65 (discussing *Erickson*, 287 Wis. 2d 204, ¶¶17-19). Wingra argues that a disability accommodation request must be accompanied by what *Erickson* refers to as "competent medical evidence of the employee's alleged impairment" so that the employer knows that the employee has a disability that the employer has a duty to reasonably accommodate. *Erickson*, 287 Wis. 2d 204, ¶17; *see also id.*, ¶19. Yet, as we have explained, the quoted portion of *Erickson* relates exclusively to what an employee must prove during a contested case hearing to establish that the employee has a disability. *Erickson* does not govern what an employee must say or do when requesting an accommodation to trigger an employer's obligations under the Act.

¶92    Nor does *Wisconsin Bell* support Wingra's interpretation.  As noted above, *Wisconsin Bell* was a disparate treatment case, not a refusal-to-accommodate case.  *Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶¶33-34, 53 n.22.  The employee in that case was discharged for misconduct, and the misconduct might or might not have been caused by the employee's disability.  *Id.*, ¶45.  The employer knew of the employee's disability diagnosis and "its symptoms in general terms," *id.*, ¶11, but, due to the "amorphous nature" of the employee's disability and the limited information the employee provided on that topic, the employer was not necessarily aware of the alleged causal connection between the employee's diagnosis and his conduct, *id.*, ¶¶45-47, 50.  Our supreme court determined that, to prove that he was discharged "because of" his disability, the employee had to show that his employer knew about the alleged causal connection between the employee's diagnosis and the misconduct for which he was discharged.  *Id.*, ¶¶40-41.  Otherwise, the court explained, the employee failed to show that his discharge for misconduct was a discharge "because of" disability.  *Id.*

¶93    This conclusion from *Wisconsin Bell* has no bearing in this case because, as we have explained, an employee need not prove that their employer discharged them "because of" their disability to succeed in a refusal-to-accommodate claim.  *Wisconsin Bell* did not involve any allegation that the employer refused to accommodate the employee's disability, and it did not discuss what information is necessary for an employer to recognize that an employee needs a disability accommodation.  *Id.*, ¶53 n.22.

¶94    Accordingly, we conclude that the statutory language is ambiguous, that our existing case law provides general guidance, but that it does not specify the precise information an employer must have about an employee's disability

before the employer faces potential liability for refusing to accommodate it. Therefore, we must construe the statute reasonably, and consistently with its purpose to "encourage and foster to the fullest extent practicable the employment of all properly qualified individuals." WIS. STAT. § 111.31(3); *see also Amazon Logistics, Inc.*, 407 Wis. 2d 807, ¶¶25-26.

¶95    We begin by rejecting Wingra's interpretation of WIS. STAT. § 111.34(1)(b) because it is not required by the statutory language and it is inconsistent with the purpose of the Act. Wingra's interpretation would impose too high a burden for employees making disability accommodation requests, and it would too easily allow employers to evade the legal responsibility of accommodating an employee's disability by endeavoring to maintain plausible deniability regarding an employee's disability.

¶96    We conclude that, under WIS. STAT. § 111.34(1)(b), an employee need not provide medical evidence of a disability alongside an accommodation request in order to put the employer on notice that it has a duty of reasonable accommodation under the Act. It is sufficient if the factual information known by the employer would reasonably lead the employer to recognize that the employee likely has a disability, as that term is defined by WIS. STAT. § 111.32(8) and Wisconsin case law. Specifically, the factual information known to the employer should allow a reasonable employer to recognize that the employee has a "physical or mental impairment which makes achievement unusually difficult or limits the [employee's] capacity to work," *see* § 111.32(8); *Hutchinson Tecnology., Inc.*, 273 Wis. 2d 394, ¶¶15-17, and that the limitation might be permanent, *see Erickson*, 287 Wis. 2d 204, ¶¶15-16.

¶97 Finally, we conclude that, if an employer is aware that their employee likely has a physical or mental limitation that constitutes a disability and the employee requests an accommodation, the employer rejects such a request outright at the employer's peril. If the employer questions whether it has a duty of reasonable accommodation under the Act, it has the right to ask for additional information, including medical information, to confirm the employee's disability. However, if the employer denies an accommodation request outright, as Wingra did in this case, the employer takes the risk that, in a claim that follows, LIRC will find that the information known to the employer was sufficient such that the employer should have recognized that the employee had a disability and was entitled to a reasonable accommodation.

¶98 We now briefly consider whether LIRC's decision about Wingra's knowledge hinges on any factual finding that is not supported by substantial evidence. *See Wisconsin Bell, Inc.*, 382 Wis. 2d 624, ¶51 (what an employer knew about an employee's disability is a factual finding that we review for substantial evidence); *see also Target Stores*, 217 Wis. 2d at 10-11. Without repeating the extensive factual background set forth above, we conclude that substantial evidence supports LIRC's findings about Wingra's knowledge. The facts set forth above in the background section of this opinion hew closely to LIRC's findings of fact, which hew closely to the testimony and documentary evidence presented at the contested case hearing. Gilbertson testified to his multiple, consistent attempts to inform Wingra of his physical condition and to request an accommodation, and his testimony and other documentary evidence support LIRC's findings about those attempts. The evidence credited by LIRC shows that, based on the consistent information Gilbertson provided, Wingra should have recognized that he was requesting a specific accommodation for a

physical condition that was limiting his capacity to work and that likely constituted a disability.[17] Yet, rather than providing an accommodation, Wingra flatly refused to consider the request. Accordingly, we agree with LIRC that Wingra violated the Act by refusing to reasonably accommodate Gilbertson's disability.[18]

¶99 Before concluding this section, we pause to comment on the references throughout LIRC's decision and the parties' briefing to the "interactive process." The "interactive process" is a concept that is rooted in 29 C.F.R. § 1630.2(*o*)(3) (last amended Mar. 25, 2011), and that is discussed in federal decisions interpreting the reasonable accommodation provision in the federal ADA. *See, e.g.*, *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005); *Rehling v. City of Chicago*, 207 F.3d 1009, 1015, (7th Cir. 2000). Federal courts have stated that, once a qualified employee with a disability requests an

---

[17] For example, Shea acknowledged that, in the summer of 2013, Balch told him that Gilbertson was complaining about foot pain and ankle soreness, that Gilbertson attributed the pain and soreness to pressing the accelerator pedal in his assigned glider truck, and that Gilbertson had asked to be reassigned to a different truck. Statements attributed to Shea and Balch lend support to LIRC's finding that Shea and Balch both knew that Gilbertson was complaining about a physical condition. Shea's statement during the September 2013 meeting ("I don't know what your condition is, but ….") demonstrates awareness that Gilbertson claimed to have a medical condition, even if Shea did not want to learn more details, as does Balch's statement from October 2013 ("I don't care how badly [Gilbertson] is hurt[.]").

[18] We briefly address and reject an alternative argument that Wingra advances in its appellate briefing. Wingra contends that Gilbertson's accommodation requests did not provide sufficient notice that he was requesting an accommodation for a disability because Gilbertson attributed the cause of his medical condition to the truck he was driving, not to a disability, and it is "no secret that gliders are rough riding/operating compared to others." This argument is without merit. The Act does not grant or deny protection to individuals based on the cause of their disability, and the fact that Gilbertson told Wingra that he believed his medical condition was caused or exacerbated by operating his assigned truck has no bearing on whether the medical condition constituted a disability.

accommodation, the ADA contemplates that the employer and employee will engage in an informal give-and-take exchange of information so that it can be determined whether an accommodation is needed and what accommodation would enable a disabled employee to continue working. *Rehling*, 207 F.3d at 1015.

¶100  Since at least 2011, LIRC has referred to the "interactive process" and federal case law addressing that process when interpreting and applying the provisions of the Wisconsin Fair Employment Act.  *See, e.g.*, *Castro v. County of Milwaukee Sheriff's Dep't*, ERD Case No. CR200800720 (LIRC Dec. 20, 2011); *Oldenberg v. Triangle Tool Corp.*, ERD Case No. CR201400272 (LIRC Feb. 28, 2018).  However, no precedential Wisconsin case has expressly adopted the interactive process as part of Wisconsin law.  *See, e.g.*, *Target Stores*, 217 Wis. 2d at 20 n.13 (declining to consider whether Wisconsin should adopt the ADA's "interactive process" for purposes of the Act because the parties did not present developed arguments on that topic).  The parties in this case appear to assume that the interactive process has already been incorporated into Wisconsin law, and none of the parties has developed an argument regarding whether we should adopt it.  It is not necessary to adopt the interactive process to resolve the questions of Wisconsin law at issue here, and we decline to do so today, especially without input on that topic from the parties.

### III.  Wingra Terminated Gilbertson's Employment

¶101  As discussed, LIRC determined that Wingra terminated Gilbertson's employment on October 23, 2013, rather than providing him with the accommodation he requested, and Wingra challenges this determination on appeal. LIRC and Gilbertson assert that LIRC's determination is a finding of fact, and Wingra does not dispute this assertion.  Based on the parties' apparent agreement

on the standard of review, we proceed to review LIRC's determination that Wingra terminated Gilbertson's employment as a finding of fact, although we observe that our conclusion would be the same if we were to independently review LIRC's ultimate determination that Wingra terminated Gilbertson's employment as a question of law. *See, e.g.*, *Nottleson v. DILHR*, 94 Wis. 2d 106, 115-16, 287 N.W.2d 763 (1980) (providing that, in unemployment compensation cases under WIS. STAT. ch. 108, whether the conduct of the employee constitutes a voluntary or involuntary termination under WIS. STAT. § 108.04(7) is a question of law heavily informed by factual findings).

¶102    Wingra contends that substantial evidence would support a finding that Gilbertson voluntarily resigned on October 22, 2013, when he handed in his time card, fuel card, and truck key (only to have them immediately returned by Sundby), or on October 23, 2013, when Gilbertson did not show up for a scheduled shift (following a conversation the day before in which Sundby excused him from work based on his medical condition and indicated that he would attempt to get Gilbertson reassigned to another truck).

¶103    To prevail in its challenge to LIRC's finding that it terminated Gilbertson's employment, Wingra must do more than point to evidence in the record from which a reasonable person could make a different finding than the one LIRC made. Instead, Wingra has the burden to show that no substantial evidence supports LIRC's finding, and that no reasonable fact finder could have made that finding from the evidence in the record and the available inferences therefrom. *Milwaukee Symphony Orchestra, Inc.*, 324 Wis. 2d 68, ¶31; *Xcel Energy Servs., Inc. v. LIRC*, 2013 WI 64, ¶48, 349 Wis. 2d 234, 833 N.W.2d 665 (providing that the burden of showing that an agency's finding is not supported by substantial

evidence is on the party seeking to set aside its findings). Wingra has not carried that burden.

¶104 LIRC's determination that Wingra terminated Gilbertson's employment rests primarily on the timeline of events Gilbertson testified to, which was corroborated by Gilbertson's emails to Sundby and Shea, and which was not meaningfully disputed by any evidence at the hearing. From that entire course of events, it is undisputed that, although Gilbertson initially indicated an intention to resign as a consequence of Wingra's refusal to provide an accommodation, Sundby did not accept his resignation attempt that day and Gilbertson rescinded it. Gilbertson did not come to work the following morning, and a reasonable fact finder would infer that he did not come to work based on Sundby's representations from the day before. Gilbertson was in contact with Sundby throughout the day, explaining that he wished to work and simply needed the accommodation that he had consistently been seeking. Sundby then called Gilbertson and told him that Wingra was "accepting his resignation," and Gilbertson responded that he had not resigned and was available to work if the accommodation could be made. Under the circumstances, a reasonable fact finder could infer that Wingra, not Gilbertson, terminated the employment relationship. *Hipke v. Badger Paper Mills, Inc.*, 261 Wis. 226, 231, 52 N.W.2d 401 (1952) (citing *Scandrett v. Industrial Comm'n*, 235 Wis. 1, 6, 291 N.W. 845 (1940) (providing that the inferences that an agency makes from undisputed facts are binding and conclusive)).

¶105 Accordingly, we conclude that substantial evidence in the record supports LIRC's finding that Wingra terminated Gilbertson's employment. We therefore need not address LIRC's alternative determination that, even if Gilbertson could be said to have resigned his employment, the circumstances would constitute a constructive discharge because Wingra's refusal to provide a

reasonable accommodation was the undisputed reason that Gilbertson's employment with Wingra came to an end. *See Marten Transp., Ltd. v. DILHR*, 176 Wis. 2d 1012, 1026, 501 N.W.2d 391 (1993) (discussing the constructive discharge doctrine).

## IV. Remedies

¶106 We now address Wingra's remaining arguments about the remedies ordered by LIRC.

### A. Back Pay

¶107 LIRC ordered Wingra to reinstate Gilbertson to a "position substantially equivalent to the position he held prior to his discharge," and it ordered Wingra to "make [Gilbertson] whole for all losses in pay [he] suffered by reason of [Wingra's] unlawful conduct." LIRC's make-whole remedy includes back pay from October 23, 2013, "until such time as [Gilbertson] resumes employment with [Wingra] or would resume such employment but for his refusal of a valid offer or a substantially equivalent position," with an offset for Gilbertson's "interim earnings."

¶108 Back pay is an available remedy in employment discrimination cases, *see* WIS. STAT. § 111.39(4)(c), and it is within LIRC's discretion to award it. *La Crosse Police & Fire Comm'n*, 139 Wis. 2d at 772. We therefore review the award of back pay for an erroneous exercise of discretion. *Id.* We will uphold LIRC's exercise of discretion as long as it is supported by the record and by an appropriate legal standard. *Id.* at 773.

¶109 Although it is within LIRC's discretion to award back pay, the availability of back pay is not unlimited. A discharged employee is expected to

mitigate their damages during their period of unemployment, and the award of back pay shall be reduced for "interim earnings or amounts earnable with reasonable diligence." WIS. STAT. § 111.39(4)(c); *see also* ***Anderson v. LIRC***, 111 Wis. 2d 245, 255, 330 N.W.2d 594 (1983); ***La Crosse Police & Fire Comm'n***, 139 Wis. 2d at 772; ***U.S. Paper Converters, Inc. v. LIRC***, 208 Wis. 2d 523, 528-29, 561 N.W.2d 756 (Ct. App. 1997). It is the employer's burden to prove that an employee failed to exercise reasonable diligence in mitigating damages. ***U.S. Paper Converters, Inc.***, 208 Wis. 2d at 527. Whether an employer has carried its burden is a question of law that we review de novo, but we will uphold the factual findings LIRC made in support of this legal conclusion if the findings are supported by substantial evidence. ***Anderson***, 111 Wis. 2d at 255, 257.

¶110 At the hearing, Gilbertson testified about his attempts to secure comparable employment from a number of employers (including Wingra) following his termination, his work with the state department of vocational rehabilitation from January 2015 through June 2017, and his acceptance of a position from another employer in April 2018. LIRC found that Wingra "introduced no evidence to suggest that there was a reasonable likelihood [that Gilbertson] would have found comparable work sooner had he exercised greater diligence," and Wingra does not argue that, generally speaking, Gilbertson failed to exercise reasonable diligence. Instead, Wingra's arguments focus on two specific dates, which correspond with applications Gilbertson submitted to Wingra seeking reinstatement to his former position as a ready-mix truck driver. Wingra argues that Gilbertson's entitlement to back pay should be cut off after those dates.

¶111 Wingra's first argument pertains to a job application Gilbertson submitted to Wingra in early 2014, after Wingra posted an advertisement for a

47

ready-mix truck driver position. Wingra did not offer the ready-mix truck driver position to Gilbertson; however, in June 2014, Wingra offered him a different position as a lowboy truck driver. During the administrative proceedings, Wingra argued that Gilbertson's decision to turn down the lowboy truck driver position constituted a failure to exercise reasonable diligence, and Wingra renews that argument on appeal.

¶112 Under Wisconsin law, a valid offer of reinstatement terminates the accrual of an employer's back pay obligation. *Anderson*, 111 Wis. 2d at 253-54. But not all offers constitute valid offers that are effective to terminate the accrual of back pay. To be valid, the offer must (among other things) be for the same position or a substantially equivalent position. *Id.* at 256. As our supreme court has explained, "a discharged … employee is not required in mitigation of damages[] to accept alternative employment of an 'inferior kind' … or employment outside of [the employee's] usual type or for which [the employee] is not sufficiently qualified by experience." *Id.* (citation omitted).

¶113 Here, LIRC found that, when Gilbertson turned down the lowboy truck driver position, he told Wingra that he did not believe he was qualified to drive a lowboy truck. As Gilbertson explained, he had no experience driving lowboy trucks and he lacked a "hazmat endorsement," which Gilbertson contended was required for the position. LIRC found that Wingra expressed no disagreement with Gilbertson's assessment of his qualifications at that time. Then, during the contested case hearing, Wingra did not offer anything to contradict Gilbertson's assessment, except to make the conclusory assertion that, in Wingra's opinion, Gilbertson was qualified to operate a lowboy truck. Wingra did not offer any other evidence on this topic and did not otherwise counter Gilbertson's testimony. LIRC concluded that, "although failure to accept a

suitable replacement employment can serve to cut off entitlement to back pay," Gilbertson was not required to accept employment as a lowboy truck driver as a means of mitigation.

¶114 On appeal, Wingra does not address the standards set forth in *Anderson* for determining whether an offer of employment is a valid offer of reinstatement, nor does it challenge any of LIRC's findings of historical fact. It simply asserts that "Wingra was aware of Gilbertson's work history, and, as the employer, it is Wingra's prerogative to determine which individuals are qualified for particular positions." This assertion fails to grapple with LIRC's findings, particularly the finding that Gilbertson told Wingra that he was not qualified for the position, and the finding that Wingra did nothing at the time to contradict this assessment. Based on our independent review of the administrative record, we agree with LIRC's conclusions that Gilbertson acted reasonably in denying the offer, and that Wingra failed to satisfy its burden of proof regarding any failure to mitigate.[19]

¶115 Wingra's second argument pertains to an application Gilbertson submitted to Wingra in January 2015 for an open ready-mix truck driver position, and it is not an argument about mitigation. It is instead an argument about

---

[19] Wingra also asserts that the fact that Wingra offered Gilbertson a position as a lowboy truck driver undercuts his assertion that Wingra discriminated against him. Wingra fails to explain how this fact could be relevant to LIRC's conclusion that Wingra violated the Act by refusing to accommodate his disability, which resulted in the termination of his employment, and we will not develop arguments on its behalf. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments that are unsupported by legal citations or are otherwise undeveloped).

whether Gilbertson's disability would have prevented him from adequately undertaking the job-related responsibilities of a ready-mix truck driver in 2015.

¶116  By way of background, LIRC made the following findings of fact regarding Gilbertson's January 2015 job application.  When Gilbertson applied for the position as a ready-mix truck driver in January 2015, he had been given work restrictions by his chiropractor, and he provided those restrictions along with his application.  The restrictions included that he not lift more than 50 pounds more than twice per hour, and that he frequently change his posture, avoid mechanical vibrations, and avoid climbing ladders or working on roofs or elevated locations.  Gilbertson stopped seeing the chiropractor in January 2015, and it is unclear for how long the work restrictions remained in effect.  Some time later, Gilbertson began seeing the spine specialist, Dr. Greenberg, who did not provide Gilbertson with any work restrictions and opined that an ergonomic change in the truck would enable him to perform the job of a ready-mix truck driver.

¶117  During the proceeding before LIRC, Wingra argued that Gilbertson was not entitled to back pay after January 2015 because his work restrictions would have prevented him from working as a ready-mix truck driver.  LIRC disagreed with this premise and concluded that Gilbertson's "entitlement to back pay" was "unaffected" by the work restrictions he had in 2015.  It observed that the work restrictions appeared to have been temporary, but even if they were long lasting, Wingra was "still obligated to attempt to offer reasonable accommodations that would allow [Gilbertson] to return to work, notwithstanding any medical restrictions he may have."  It noted that reasonable accommodations may include restructuring the physical demands of the job, *see Crystal Lake Cheese Factory*, 264 Wis. 2d 200, ¶52, and that Wingra failed to prove that Gilbertson "has any

medical restrictions that would prevent him from performing the job" of a ready-mix truck driver, "with or without reasonable accommodations."

¶118 On appeal, Wingra asserts that LIRC is wrong because the 2015 medical restrictions prove that Gilbertson was unable to work as a ready-mix truck driver in 2015. Without any citation to authority, it asserts that, if Gilbertson could not work as a ready-mix truck driver in 2015, he is not entitled to back pay from that date forward. Wingra then takes its argument one step further, summarily speculating in a footnote that, had Gilbertson seen a medical professional while he was still employed by Wingra, "he likely would have been restricted from working as a [ready-mix] driver then, which should foreclose" any back pay following the termination of his employment.

¶119 Framed in this light, Wingra's argument appears to be a backdoor attempt to raise a truncated version of one of the defenses that is available under WIS. STAT. § 111.34(1)(b) or (2)(a)—that making an accommodation would pose a hardship on Wingra's program, enterprise, or business, or that Gilbertson would be unable to undertake the job-related responsibilities of his employment even with reasonable accommodation. *See supra*, ¶53 (discussing an employer's defenses to a reasonable accommodation claim). We observe that Wingra did not raise these defenses to Gilbertson's claims during the administrative proceedings, but if Wingra had done so, it would have had the burden of proof.

¶120 For purposes of addressing Wingra's argument, we assume without deciding that an employee's entitlement to back pay could end if the employee's disability progresses to the point that it is "reasonably related to the employee's ability to adequately undertake" the employee's job responsibilities, as contemplated by WIS. STAT. § 111.34(2)(a), and the employer cannot

51

accommodate the employee's disability without incurring hardship. But this is no small assumption in Wingra's favor—as mentioned, Wingra cites no legal authority for this proposition. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider arguments that are unsupported by legal citations or are otherwise undeveloped).

¶121 Even with that assumption, Wingra fails to convince us that Gilbertson's 2015 medical restrictions would render him unable to "adequately undertake the job-related responsibilities" of a ready-mix truck driver in 2015 or at any other time. Wingra makes only a bare assertion—without appropriate record citations—that lifting more than 50 pounds more than twice per hour, climbing ladders, and working on elevated locations are all "essential functions" of the job of a ready-mix truck driver. But even assuming that they are, that does not mean that Gilbertson would be unable to adequately undertake the responsibilities of a ready-mix truck driver with reasonable accommodation. As discussed, Wingra would have the burden of proof on these issues; it has not shown, much less argued, that it could not reasonably accommodate each of Gilbertson's 2015 medical restrictions, nor does it argue that accommodating any of the restrictions would impose hardship. *See supra*, ¶53.

## B. Attorney Fees

¶122 LIRC is authorized to award attorney fees to a prevailing complainant. *Watkins v. LIRC*, 117 Wis. 2d 753, 345 N.W.2d 482 (1984) (interpreting WIS. STAT. § 111.39(4)(c)). "The first step in calculating an attorney fee award is to multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Rice Lake Harley Davidson v. LIRC*, 2014 WI App 104, ¶62, 357 Wis. 2d 621, 855 N.W.2d 882. "This 'lodestar' figure may then be

adjusted upward or downward, based on various factors." *Id.* "The amount of attorney fees which are reasonable and therefore should be awarded to a successful … complainant is a discretionary determination," *id.* (citation omitted), and we will not substitute our judgment for LIRC's on any issue of agency discretion. *See* WIS. STAT. § 227.57(8).

¶123 Following extensive briefing by the parties, LIRC ordered Wingra to pay some, but not all, of the attorney fees Gilbertson incurred during the administrative proceedings. LIRC's written decision on fees spans eight pages, throughout which LIRC carefully considered the evidence and the parties' arguments regarding which fees were compensable and which were not.

¶124 In its opening appellate brief, Wingra argues that Gilbertson's attorney fees should be reduced in two additional respects. LIRC and Gilbertson respond to Wingra's arguments in their respective response briefs, but Wingra does not mention attorney fees at all in its reply brief. We could deem Wingra's arguments about attorney fees conceded based on Wingra's failure to respond to LIRC's or Gilbertson's arguments. *See **United Coop. v. Frontier FS Coop.***, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578. However, for the sake of completeness, we address Wingra's arguments.

¶125 Wingra first challenges LIRC's decision not to reduce the hourly rate of one of Gilbertson's attorneys for 19 hours that he spent engaging in what Wingra refers to as "non-legal work" that Wingra asserts could have been performed by a paralegal or secretary. However, in its decision, LIRC determined that it was "not clear that the tasks identified by [Wingra] are necessarily clerical/non-legal in nature." Wingra's appellate briefing does not identify the tasks that it contends should have been completed by support staff, and it provides

no citation to anything in the agency record that contains these billing descriptions. Without any citation to the record, we are not in a position to second guess LIRC's determination. *See* WIS. STAT. RULE 809.19(1)(e); *Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990) (if a party fails to support its argument with record citations, we need not consider the argument because "it is not the duty of this court to sift and glean the record … to find facts which will support" the party's argument (citation omitted)).

¶126 Wingra also challenges LIRC's decision to award Gilbertson 25.3 hours in fees for time that one of his attorneys spent preparing for the September 2018 hearing before the administrative law judge. Wingra argues that this amount of time was unreasonable because the attorney in question did not attend the hearing, and another attorney also billed for time that he spent preparing for the same hearing. Once again, Wingra's argument is not supported by appropriate record citations and is entirely undeveloped—Wingra does not identify any specific tasks that were unnecessary or duplicative, nor does it cite to any portion of the agency record in which the purportedly unnecessary or duplicative billing records appear. Nor does Wingra make any attempt to grapple with the reasoning that LIRC supplied for awarding these fees. LIRC explained that Gilbertson's attorney billed for tasks that were necessary and compensable, whether or not the attorney personally attended the hearing, and Wingra's bare assertions to the contrary provide us with no reason to upset LIRC's exercise of discretion on this issue.

¶127 Before concluding, we observe that, in the response Gilbertson filed in the circuit court to Wingra's petition for judicial review, he has also asked for his reasonable attorney fees incurred in this judicial review proceeding, provided that LIRC's order is affirmed. We remand to the circuit court to determine an

appropriate award. *See Watkins*, 117 Wis. 2d at 765-66. We do not perceive Wingra to be disputing Gilbertson's entitlement to fees to the extent that Gilbertson prevails in this judicial review proceeding, but if it is, it can make those arguments on remand.

## CONCLUSION

¶128 For the foregoing reasons, we affirm LIRC's order in its entirety and remand for the circuit court to determine an appropriate award of fees for the judicial review proceedings.

*By the Court.*—Order affirmed and cause remanded.